**FILED**
6/23/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

CVK

RECEIVED
JUN 18 2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

Jessica Lehman,

Plaintiff,

v.

City of Chicago,

Defendant.

1:26-cv-07202
Judge Joan H. Lefkow
Magistrate Judge M. David Weisman
Random/Cat 2

Case No. _____

Judge _____

## COMPLAINT FOR PERMANENT INJUNCTIVE AND COMPENSATORY RELIEF

1. Plaintiff brings this action pursuant to Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act to challenge the City of Chicago's discriminatory policies, practices, and funding decisions that categorically exclude people with sensory-based and trauma-based disabilities from meaningful access to the very emergency and residential shelter programs the City chooses to operate, coordinate, and fund through its Department of Family & Support Services (DFSS). Although the City maintains a hotel-based non-congregate program for domestic-violence and

gender-based-violence survivors, it has created no comparable non-congregate, sensory-appropriate option for residents to participate in on the basis of disability whose medical needs similarly require private, low-stimulus environments. Instead of establishing an accessible, City-run reasonable-accommodation process, the City attempts to outsource its ADA obligations to delegate agencies that it funds and controls—agencies that, by design, lack the authority, resources, or procedures to grant, track, or implement disability-based accommodations. By allocating resources almost exclusively to congregate models designed for nondisabled individuals, and by refusing to create any ADA-compliant accommodation pathway, the City has constructed a shelter system that sensory-disabled residents cannot safely use, thereby depriving them of any meaningful opportunity to request, engage in, or receive reasonable accommodations through the interactive process required by federal law—regardless of whether any particular accommodation request might ultimately be deemed reasonable.

2. Plaintiff Jessica Jamie Lehman is a 24-year-old autistic transgender woman who is homeless and sought emergency shelter from the City of Chicago from April 8, 2026 until her placement in a city-funded confidential hotel shelter program on April 28, 2026. Despite presenting extensive medical documentation from her treating psychiatrist establishing that congregate shelter settings are medically contraindicated due to severe sensory processing disorder, the City repeatedly failed and refused to provide a reasonable accommodation on the basis of disability—specifically, a private, sensory-controlled sleeping environment such as a hotel voucher or private respite bed. Only after reclassifying her as a gender-based violence survivor did the city finally begin to meet their legal obligations to the plaintiff through its delegate agency SGA Youth &

Family Services (SGA) who operates the program. After Plaintiff later informed SGA staff that she intended to request disability accommodations related to her ongoing housing needs, SGA issued a retaliatory termination notice the next day effective June 2, 2026. That termination was withdrawn only after Plaintiff served an emergency TRO motion on the City's Law Department.

3. The City's refusal is not an isolated error. It is the direct result of systemic policies and practices, including: (a) an inaccessible intake system (311) that cannot process or track reasonable accommodation requests or appropriate provider documentation; (b) a deliberate post-COVID elimination of hotel voucher placements as an accessibility accommodation when medically necessary; (c) a bad-faith redefinition of "non-congregate" to include shared rooms with shared bathrooms, thereby evading its legal obligations; and (d) **choosing to deny hotels or other reasonable sensory-safe and trauma-safe accommodations for those with disabilities while granting them to Domestic Violence and Gender-Based Violence survivors.** This internal definition directly conflicts with definitions used by the Illinois Housing Development Authority (IHDA) and the U.S. Department of Housing and Urban Development (HUD), which define "non-congregate" shelter as facilities providing private rooms or units with private sanitary facilities. The City committed the tort of Failure to Accommodate when, operating without any ADA-required interactive process, it denied Plaintiff a reasonable accommodation by offering a medically contraindicated shared room despite documented medical evidence requiring a non-congregate placement and then closing the case when she declined. This denial of accommodation directly resulted from the City's absence of an interactive process, which is caused by DFSS and its delegate agencies **failing to**

**maintain any public contact for staff who can grant an ADA accommodation, an ADA grievance process, an appeal mechanism, or any documented ADA workflow.**

4. As a direct and proximate result of the City's discriminatory conduct, Plaintiff has suffered: (i) preventable psychiatric crises, including a 988 call for suicidal ideation; (ii) two emergency room visits; (iii) the depletion of her limited personal funds on hotel rooms to avoid medically unsafe shelter placements; and (iv) emotional distress and physical harm.

5. Plaintiff attempted to access the City's emergency shelter system through all available channels, including three separate 311-initiated placement attempts including attorney escalation directly to DFSS, each of which failed because the City did not provide the ADA/Section 504-required accommodations necessary for Plaintiff's safe participation nor conduct an interactive process. When DFSS closed Plaintiff's shelter request on April 21, 2026, it left her with no safe alternative and effectively abandoned her to a state of homelessness that her psychiatrist warned would "predictably result in psychiatric destabilization" (See Exhibit A) until her placement in a confidential hotel shelter program solely on the basis of her being a gender-based violence survivor with SGA Youth & Family Services (SGA) on April 28th, 2026.

6. The standard instruction given after DFSS closed the shelter request was to re-enter the 311 queue. Plaintiff's disability makes that process functionally impossible. Plaintiff is not challenging the existence of a queue; she is stating that she is unable, because of her sensory and trauma-based disabilities, to stand in it. Moreover, even when she reached the front of the queue, the system reset her to the back three separate times. A process

that repeatedly erases a disability-related accommodation request is not a remedy; **it is a denial of access.**

7. The harm is ongoing. Plaintiff's current hotel placement expires on June 26, 2026. The City has not responded to her formal ADA accommodation request (submitted June 6, 2026) asking for a continued non-congregate placement. If the placement expires, Plaintiff will be forced to re-enter the 311 queue – the same inaccessible process that failed her three times before – or face homelessness and psychiatric destabilization. The retaliatory termination, though withdrawn, has created a continuing threat of adverse action should Plaintiff again request accommodations. Moreover, although SGA regularly extends stays for other residents beyond 60 days using its discretion, it has refused to extend Plaintiff's stay – instead issuing a retaliatory termination notice the day after she informed staff she would seek an extension as a reasonable accommodation – solely because she requested disability accommodations. Thus, Plaintiff continues to suffer irreparable harm. Moreover, the City has ignored Plaintiff's June 6 accommodation request and settlement offer, forcing her to seek judicial relief.

8. Plaintiff seeks: (a) reimbursement of hotel costs incurred due to the city's Failure to Accommodate; and (b) permanent injunctive relief to remedy the City's discriminatory policies and practices against persons with disabilities in Chicago's homeless system.

---

## II. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 (federal question) because this action arises under Title II of the Americans with

Disabilities Act, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

10. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this district (Chicago, Illinois) and Defendant City of Chicago resides in this district.

11. Plaintiff's claims are timely. The statute of limitations for claims under Title II of the ADA and Section 504 of the Rehabilitation Act in Illinois is two years, borrowed from Illinois's personal injury statute, 735 ILCS 5/13-202. Plaintiff's injuries began accruing on April 8, 2026, and this complaint is being filed well within that period. No administrative exhaustion is required prior to filing this action under either statute.

---

## III. PARTIES

### A. Plaintiff and Contact Information

12. Plaintiff Jessica Jamie Lehman is a 24-year-old transgender woman and survivor of gender-based violence. She has multiple disabilities, including Autism Spectrum Disorder (ASD), Major Depressive Disorder (MDD), Post-Traumatic Stress Disorder (PTSD), and Borderline Personality Disorder (BPD). Beginning April 8, 2026, Plaintiff sought emergency shelter through the City of Chicago's homeless system. Between April 8 and April 28, 2026, she suffered preventable psychiatric crises, including suicidal ideation, two emergency room visits, depletion of her personal funds on hotel rooms, and

emotional and physical harm. On April 28, 2026, Plaintiff was placed in a City-funded confidential hotel shelter program for survivors of gender-based violence. That placement met her sensory and trauma needs, but it was provided based solely on her re-classification as a gender-based violence survivor, not based on her disability needs. Plaintiff can be reached at: jessica@jessicaj.studio

13. Plaintiff is a "qualified individual with a disability" under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(2), and under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. She is entitled to the protections and reasonable accommodations required by those federal laws.

## B. Defendant

14. Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois. It operates the Department of Family and Support Services (DFSS), which funds, regulates, coordinates, and oversees the City's emergency shelter system, including the 311 intake process, the Coordinated Entry System (CES), and delegate agencies such as A Safe Haven Foundation and SGA Youth & Family Services (SGA).

15. Defendant is a "public entity" within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1), and a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. As such, Defendant is subject to the non-discrimination and reasonable accommodation requirements of both statutes.

---

## IV. STATEMENT OF FACTS

A. Plaintiff's Medical Condition and Documented Need for Accommodation

16. The plaintiff was under the care of Dr. Paula Mathewson, MD, her psychiatrist at Sandra Eskenazi Mental Health Center in Indianapolis, from August 2023 to April 2026. Dr. Mathewson has provided a detailed letter (dated April 2, 2026) documenting Plaintiff's diagnoses and the functional limitations caused by her disabilities. (*Copies attached as Exhibit A.*)

17. Dr. Mathewson's letter states, in relevant part:

*"Due to Autism Spectrum Disorder and trauma-related symptoms, Jessica experiences severe sensory overstimulation in crowded, noisy, or unpredictable environments. These episodes can result in acute anxiety, agitation, dissociation, shutdowns, or meltdowns requiring prolonged periods of isolation to recover. For this reason, congregate shelter settings are medically unsafe for Jessica and would predictably result in psychiatric destabilization."*

*"Jessica requires access to a private or sensory-controlled sleeping environment to regulate sensory input, prevent overstimulation, and maintain psychiatric stability. This includes the ability to use noise-canceling headphones, her phone, and related assistive devices at all times for sensory regulation and emergency communication."*

18. The medically necessary accommodations prescribed by Dr. Mathewson include:

   a. A private, non-congregate, sensory-controlled sleeping environment;

   b. 24/7 access to her sleeping space (no lockout hours);

   c. Use of noise-canceling headphones and phone for sensory regulation;

   d. Predictable transitions and advance notice of changes;

      e.   Limited in-person case management requirements

## B. Nature of the Accommodation Requested

19. The accommodation requested was simple, medically necessary, and one that the City already provides to other populations: a private, non-congregate sleeping environment with a private bathroom and shower access, such as a hotel voucher or private respite bed. The City routinely grants identical hotel-based, private-room accommodations to survivors of domestic violence and gender-based violence. When Plaintiff requested the same accommodation based on her disability, the City refused to engage in any meaningful interactive process on the basis of disability. She only received services after she was re-classified as a gender-based violence survivor—and even then, the accommodation was provided based solely on that re-classification, not on her disability needs. The requested accommodation itself remains simple, medically necessary, and well within the City's existing capacity to provide to persons with disabilities.

## C. Chronology of City's Discriminatory Conduct

## C.1. Plaintiff's Shelter History (April 8 – April 28, 2026)

*April 8–9, 2026: Initial Request and Unsafe Discharge*

20. On April 8, 2026, Plaintiff presented to the Emergency Department at UChicago Medicine Hyde Park seeking mental health stabilization and shelter. After stabilization, hospital staff called 311 and created Service Request # SR26-00636635. The SR's subject line stated only: "Jessica-Jamie is special needs, she's autistic." (Copy of Work Order Summary attached as Exhibit B.)

21. Plaintiff spent the night of April 8, 2026, in the Emergency Room waiting lobby and on a bench. She was not admitted to an inpatient unit, and she was not provided with a safe, sensory-controlled space to rest. The City's 311 system and its transportation and shelter delegate agency, Catholic Charities, never notified Plaintiff that transportation had been arranged to a shelter. Hospital staff only informed her several hours after the fact that a vehicle had allegedly arrived and left. No shelter placement was ever secured due to the inaccessibility of the City's 311 system, and no reasonable accommodation for her documented sensory disability was offered during this overnight wait. The only alternative the hospital could offer—SPARC—is a congregate waiting area that is wholly inaccessible for individuals with sensory-based disabilities. As a direct result of the City's failure to provide a reasonable accommodation or a functional notification system, Plaintiff was forced to remain overnight in an unsafe, overstimulating environment with no sensory-controlled space.

22. On the morning of April 9, 2026, after the City's failed placement attempt was confirmed and Plaintiff continued to be denied a safe, quiet space to regulate her sensory needs, she was directed to SPARC—a congregate waiting area the City funds and operates, which is inaccessible to her. The mix of the complete absence of any City-provided sensory-safe alternative and staff yelling at her caused Plaintiff to become nonverbal and shake—a predictable trauma response for an autistic individual with PTSD. As a direct result of the City's ongoing failure to accommodate her disability, Plaintiff spent most of the day in a state of sensory overload and psychiatric distress, leading to her readmission to the Emergency Room.

23. The City of Chicago's own Tier II Hospital Discharge Guidelines (September 2025) explicitly state that individuals who cannot safely manage Activities of Daily Living (ADLs) with reasonable accommodations—or who are in an acute mental health episode—cannot be discharged to City-funded shelters. Plaintiff cannot perform ADLs, such as following directions or verbally communicating, when her sensory environment needs cannot be met. Despite Plaintiff's documented medical need for a private, sensory-controlled environment, the City's shelter system had no placement that complied with its own Tier II guidelines. The only options the City made available to Plaintiff were SPARC, a congregate waiting area that is inaccessible to individuals with sensory disabilities, or the street. The City's failure to provide a Tier II-appropriate, sensory-safe placement directly forced Plaintiff into an unsafe and medically contraindicated situation.

24. After spending two days in the Emergency Room with no safe, sensory-controlled shelter placement from the City, Plaintiff had no realistic option for a safe discharge other than to use her personal funds to secure a hotel room. Later on April 9, 2026, she booked a room at The Chicago Hotel Collection Ambassador Gold Coast. The City offered no funded, accessible alternative that would allow her to leave the hospital without being placed in a congregate setting or on the street where she would rapidly deteriorate again.

*[Attempted Institutionalization (Olmstead Violation)*

25. While Plaintiff was in the Emergency Room on April 9, 2026, the only placement that could be identified as a potential discharge option—because the City had no accessible, community-based shelter placement available—was an institutional group home setting. This attempted discharge to an institution occurred solely because the City failed to

provide any integrated, sensory-safe shelter alternative. The City's failure to offer a community-based placement directly caused this attempted institutionalization, which violates the integration mandate of *Olmstead v. L.C.*, 527 U.S. 581 (1999), and Title II of the ADA.

26. Just as the State of Illinois could not avoid its ADA and *Olmstead* obligations by delegating long-term care services to nursing homes, see *Colbert v. Pritzker*, 2013 WL 5405656 (N.D. Ill. Sept. 26, 2013), the City of Chicago cannot avoid liability for discrimination carried out by its delegate agencies. In *Colbert*, this Court held that the State remained responsible for ensuring community-based options even though services were delivered through private facilities. Likewise here, the City remains responsible for ensuring ADA-compliant, community-based access to shelter services, and its failure to provide such an integrated alternative directly resulted in the attempted institutionalization described above.

*April 10–11, 2026: Predictable Psychiatric Crisis at Congregate Shelter*

27. On the night of April 10, 2026, Plaintiff presented for emergency shelter at delegate agency A Safe Haven Foundation, a congregate shelter for youth. During her stay, she was:

    a. Denied access to a safe showering space as a transgender woman;

    b. Misgendered by staff;

    c. Informed by an intake worker that she "shouldn't have been allowed in";

    d. Locked out during the day with no sensory-safe place to regulate.

28. As predicted by her psychiatrist, the congregate shelter environment triggered a severe psychiatric crisis. On April 11, 2026, Plaintiff experienced suicidal ideation and called

988. She was transported by mobile crisis response to Thresholds Living Room, a crisis stabilization program, where she spent the night.

*April 12–27, 2026: Self-Funded Hotel and AirBnB Stays Caused by the City's Failure to Provide an Accessible Placement*

29. With no safe or ADA-compliant shelter option available from the City, Plaintiff was forced to secure her own temporary lodging. From April 12 through April 21, she paid for hotels night-by-night using limited SSI backpay, while a family member covered additional nights and now seeks reimbursement. Plaintiff depleted her savings and incurred debt to maintain a private, sensory-controlled environment because the City offered no funded, accessible alternative.

30. During this period, on April 15, Plaintiff experienced a sensory-overload crisis with no safe place to regulate; Thresholds Living Room, a City-funded crisis provider, acknowledged that Plaintiff required a private, sensory-safe space but lacked the capacity to provide one, again leaving Plaintiff to pay out-of-pocket for a hotel room.

31. When the 311 case was closed on April 21, Plaintiff still had nowhere to go. From April 22 through April 27, she stayed at an AirBnB at 6540 North Glenwood Avenue, paid for by the same family member who had covered prior hotel nights and who now seeks reimbursement. All out-of-pocket lodging expenses—whether paid from Plaintiff's SSI funds or by her family—were a direct result of the City's failure to provide any reasonable accommodation.

C.2. The City's Failed Placement Process and Interactive Process Breakdown (April 17 – April 21, 2026)

April 17, 2026: *Attorney Intervention and DFSS Promise of Non-Congregate Placement*

32. On April 17, 2026, Attorney Kyle Voils of the Law Project of the Chicago Coalition to End Homelessness contacted DFSS on Plaintiff's behalf. In those communications, Voils identified that Plaintiff could be categorized as a gender-based violence survivor. (*Email correspondence with attorney attached as Exhibit C.*)

*April 20, 2026: Two Failed Placements in One Day—Systemic Misrouting and Constructive Denial of Accommodation*

33. On the morning of April 20, 2026, Attorney Voils informed Plaintiff that DFSS had confirmed a non-congregate space was available. However, later that day, Plaintiff received a call from A Safe Haven Foundation directing her to report to their office first to "fill out paperwork" and then she would be routed to the Primo Center at 6212 S. Sangamon—a congregate triage shelter for single women. This was a congregate setting in a shared room with no privacy in showering/bathroom arrangements, wholly inconsistent with the non-congregate placement DFSS had promised to counsel.

34. Plaintiff visited the A Safe Haven office at 10 S. Kedzie to investigate. Staff provided her with a printed document showing that her original SR# (SR26-00636635) had been reactivated and contained only the limited information the hospital originally provided on April 8, 2026. All details regarding her ADA/IHRA accommodation needs, the involvement of counsel, and DFSS's prior commitment to a non-congregate placement had been erased from the system. (Copy of reactivated SR document attached as Exhibit D.) Plaintiff declined this placement after staff at A Safe Haven called Primo and

confirmed they do not have any non-congregate placements at the shelter and she then chose to return to her private-paid hotel for safety.

35. At 4:47 PM that same day, Ian from A Safe Haven Foundation called Plaintiff a second time to offer another placement, described only as "non-congregate." No specific details about the sleeping arrangements, bathroom facilities, or showering space were provided during this call, as Ian was unable to provide any additional information. Given that Plaintiff had already been misrouted to a congregate shelter earlier that day based on an outdated and incomplete service request along with her attorney having not been notified, she reasonably believed this second call was related to the same inappropriate placement attempt and declined the offer, citing the placement's lack of ADA-compliant reasonable accommodation.

36. The plaintiff's attorney was not notified of this second placement attempt at the time, despite DFSS having previously communicated directly with counsel and having promised a non-congregate placement. The City subsequently used this declined placement as justification to close Plaintiff's SR number, leaving her without any safe shelter option.

*April 20-21, 2026: DFSS Admits Zero Accessible Inventory Exists*

37. On April 20, 2026, DFSS admitted that its definition of "non-congregate" includes shared rooms and that no private, non-shared rooms were available for Plaintiff. That day, DFSS informed Plaintiff's attorney, Kyle Voils, that the room offered was "non-congregate" but shared with another person, and that DFSS's conception of "non-congregate" does not mean a private individual room. When counsel asked whether there were private, non-shared room options that could accommodate Plaintiff's disabilities needs, DFSS

responded that "there are no non-shared rooms available at this time." (See Exhibit C, email from Kyle Voils to Plaintiff dated April 20, 2026.)

38. On April 21, 2026, DFSS further admitted that no private rooms were available and that the only option was to restart the 311 queue. Attorney Voils informed Plaintiff that DFSS had confirmed: (a) the original room offered on April 20 did not have a private bathroom; (b) that room was no longer available; (c) DFSS was "investigating a gender-based violence specific resource to see if there is a private space available there"; (d) DFSS was "monitoring if a private space in the shelter system comes available, but noted that they are extremely limited"; and (e) Plaintiff's previous shelter request had been closed out, and her only option was to call 311 and start over. She did not do so, as it would have been her fourth time restarting the non-existent interactive process.

39. In effect, DFSS admitted that there is currently no functional shelter bed in the entire City of Chicago system that meets Plaintiff's disability-related needs. The only pathway offered — re-entering the inaccessible 311 queue — is the same pathway that has repeatedly failed Plaintiff and resulted in unsafe placements and psychiatric crises.

*June 6-15, 2026: Ignored Request for ADA Interactive Process and Accommodations*

40. On June 6, 2026, Plaintiff transmitted a formal ADA accommodation request to DFSS and an Offer for Waiver of Rights to the City's Corporate Counsel (a.k.a the Law Department) via fax. Neither responded in good faith. Plaintiff faxed to DFSS a detailed reasonable accommodation request (attached as Exhibit I), seeking a continued non-congregate hotel placement and asking DFSS to identify the staff member responsible for processing ADA accommodations.

41. DFSS was asked to respond by the end of business June 15, 2026. On the same day, Plaintiff faxed to the City's Law Department an Offer for Waiver of Rights, proposing to waive all past claims in exchange for a continued hotel placement and a simple online ADA accommodation request form on the DFSS website. The Law Department was asked to respond by the end of business June 12, 2026. Plaintiff also left a voicemail for the Law Department on June 10, 2026, reminding them of the pending offer and its deadline. As of the filing of this complaint, DFSS has not responded to the ADA accommodation request, and the Law Department has not responded to the Offer for Waiver of Rights. Their silence constitutes a constructive denial and a failure to participate in good faith.

D. Structural Flaws in the 311 Intake System

42. The City's 311 shelter request system is structurally inaccessible to individuals with sensory, trauma-based, or communication-related disabilities. These barriers are not isolated errors but inherent features of a system designed without any mechanism to accommodate disabled residents who require advance notice, predictable transitions, or sensory-safe environments. As a result, individuals with disabilities are denied meaningful access to the City's emergency shelter programs. Specifically:

    a. Failure to provide advance notice of transportation or placement details.

        The 311 system provides no written or verbal notice of when transportation will arrive, where it will take the individual, or what the sleeping, bathroom, or showering arrangements will be. Vehicles often arrive without warning, and no call or text is made before they depart. Disabled residents cannot assess whether a

placement is medically safe before being expected to board a vehicle, making the system inaccessible to individuals who require advance preparation for transitions.

43. Failure to provide any documentation of placement offers.

    a. The system provides no written confirmation of placement details, no description of the environment, and no opportunity to review or decline a placement based on disability needs. Without documentation, disabled residents cannot meaningfully participate in the interactive process or communicate their needs to delegate agencies nor the City.

44. Routing disabled residents to medically unsafe waiting rooms and triage spaces.

    a. Even when sensory disabilities are explicitly mentioned, the system routinely directs individuals to congregate waiting rooms, triage centers, or intake spaces that are loud, crowded, unpredictable, and medically unsafe. These environments predictably trigger sensory overload, dissociation, and psychiatric destabilization for individuals with sensory-based disabilities.

45. No mechanism to request or receive reasonable accommodations, nor any interactive process.

    a. The 311 system has no process for requesting reasonable accommodations and does not engage in the interactive process. There is no mechanism for granting or denying accommodation requests, no appeals or reconsideration process, no acknowledgment that the City or its delegate agencies will honor disability-related requests, no way to submit provider documentation, and no workflow for escalating disability needs to DFSS. As a result, disabled residents are treated

identically to nondisabled callers, regardless of medical necessity. Each failed placement attempt forces disabled residents to restart the non-existent interactive process by calling 311 anew, often after experiencing physical and/or psychiatric harm only to repeat the cycle.

46. No alternative intake pathway for individuals with sensory or communication disabilities.

   a. The City provides no accessible alternative to the 311 phone system—no online form, no text-based option, no email intake, and no ADA-compliant in-person process. Individuals who cannot safely use the phone due to sensory overload or trauma symptoms are effectively excluded from the shelter system.

47. Delegate agencies are informed of disability-related needs, but the City provides no capacity to meet them.

   a. The City's internal system transmits limited "tags" or notes to delegate agencies indicating that a caller has sensory, trauma, or other disability related needs. However, the City has not provided these agencies with the funding, training, staffing, or physical infrastructure necessary to process or honor such accommodations. As a result, the City creates the appearance of an accommodation process while providing no actual means for agencies to implement accommodations.

48. The City's choice to operate a shelter network triggers ADA obligations it has not met.

   a. While the City is not obligated to provide shelter to every resident, once it chooses to operate and fund a shelter network, it must ensure that disabled residents have meaningful access to that network. The City already allocates hotel-based, private-room capacity to Domestic Violence and Gender-Based

Violence survivors. Its refusal to allocate any comparable capacity to disabled residents whose medical needs similarly require private rooms and private bathrooms constitutes discrimination under Title II of the ADA and Section 504 by elevating one protected class above another.

49. The system's design prevents any meaningful interactive process.

a. **The City's own published policies promise reasonable modifications but provide no functional process for shelter residents with disabilities.** The City's official Notice of Nondiscrimination (see Exhibit J) states: "Modifications to Policies and Procedures: The City of Chicago will make all reasonable modifications to policies and procedures to ensure that people with disabilities have an equal opportunity to enjoy all of its programs, services and activities. … Anyone who requires a modification of policies or procedures to participate in a program, service, or activity of the City of Chicago, should contact the department or agency responsible for the program, service or activity." The City's Grievance Procedure, available on the same website, provides a process for filing complaints after discrimination has occurred, but it does not establish any mechanism for requesting a reasonable accommodation in real time. Moreover, the Grievance Procedure identifies only a single, city-wide ADA Coordinator (Rachel Arfa of the Mayor's Office for People with Disabilities), not any DFSS-specific employee with authority to grant accommodations in the shelter system. Consequently, when Plaintiff contacted DFSS (through 311, her attorney, and via fax) to request a reasonable accommodation, there was no designated DFSS employee to receive or process her request, no real-time interactive process,

and no way to obtain a modification to shelter policies – precisely the type of systemic failure that these webpages are supposed to prevent.

b. Because the 311 system cannot provide notice, cannot document disability needs, cannot transmit accommodation requests, and cannot ensure safe routing, disabled residents are denied any meaningful opportunity to request, engage in, or receive reasonable accommodations. Each failed placement attempt forces disabled residents to restart the process, often after experiencing physical or psychiatric harm.

## E. Damages Incurred by Plaintiff

50. As a direct and proximate result of Defendant's failure to provide a reasonable accommodation and subsequent retaliatory conduct, Plaintiff incurred significant out-of-pocket housing expenses. Specifically, Plaintiff was forced to pay for hotel rooms and an Airbnb stay to avoid medically unsafe congregate shelter placements. These costs exceed $2,000 to date. Plaintiff has not yet completed a full itemization of these expenses and reserves the right to supplement the record with detailed documentation as it becomes available. Plaintiff continues to suffer ongoing harm, including the threat of losing her current placement on June 26, 2026, and being forced back into the inaccessible 311 queue.

## V. LEGAL FRAMEWORK AND VIOLATIONS

A. Title II of the ADA (42 U.S.C. § 12131 et seq.) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

51. Title II of the ADA prohibits public entities from excluding qualified individuals with disabilities from participation in, denying them the benefits of, or subjecting them to discrimination in any of their programs, services, or activities. The City of Chicago, through its Department of Family and Support Services (DFSS), operates and funds the city shelter system, including the 311 intake process and the network of delegate agencies that provide shelter placements. These activities constitute "services, programs, or activities" of a public entity within the meaning of Title II.

52. Title II requires public entities to provide reasonable modifications to policies, practices, and procedures when necessary to avoid discrimination on the basis of disability, unless the entity can demonstrate that the modification would fundamentally alter the nature of the service or impose an undue burden. The ADA envisions a "flexible, interactive process" by which the entity and the individual work together to determine an appropriate reasonable accommodation. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). This interactive process requirement applies to public entities under Title II, including the City of Chicago. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000). The City's failure to provide – and to continue to provide – a private, sensory-safe sleeping environment, despite documented medical necessity, and its failure to maintain any functional accommodation process, violate these statutory obligations.

53. Section 504 prohibits discrimination on the basis of disability by any program or activity receiving federal financial assistance. The City of Chicago receives federal funding for its

homeless services system, including Emergency Solutions Grant (ESG) funds and other HUD-supported programs. As a recipient of federal financial assistance, the City is required to provide reasonable accommodations, avoid policies that have a discriminatory effect on individuals with disabilities, and ensure meaningful access to all programs and services it operates or funds.

54. Section 504 imposes an affirmative obligation to modify policies and practices when necessary to prevent discrimination. The City's refusal to provide a private, non-congregate placement—while simultaneously providing identical accommodations to Domestic Violence and Gender-Based Violence survivors—constitutes discrimination under Section 504 because it denies disabled residents meaningful access to the shelter system the City has chosen to operate.

55. Under Title II of the ADA, 42 U.S.C. §§ 12131(1)(B), 12132, the City is responsible for ensuring that its programs and services - including those administered through contractors functioning as its instrumentalities, such as SGA Youth & Family Services - are provided in a nondiscriminatory manner. The ADA's implementing regulations further clarify that a public entity may not, through its methods of administration or use of contractors, subject individuals with disabilities to discrimination. See 28 C.F.R. § 35.130(b) (1)-(3).

B. Defendant's Violations

56. Failure to Accommodate: Defendant failed and refused to provide Plaintiff with a private, sensory-controlled sleeping environment (i.e., a hotel voucher or private respite bed) from April 8th to April 28th, and continues to deny her a reasonable accommodation for her ongoing housing needs – including by failing to respond to her June 6, 2026 ADA

accommodation request and by refusing to extend her current placement beyond its June 26, 2026 expiration – despite her documented medical necessity and that extensions are regularly granted to non-disabled peers. Providing such an accommodation is neither an undue burden nor fundamental alteration under applicable disability law because:

- The cost of a hotel voucher plus associated services is often equal to or less than the cost of a congregate shelter bed;

- The City has historically provided hotel vouchers during the COVID-19 pandemic and for other populations (e.g., domestic violence survivors);

- The accommodation is medically necessary to prevent psychiatric deterioration, suicidal ideation, and hospitalization;

- When Plaintiff is placed in a medically inappropriate congregate setting, she predictably enters psychiatric crisis, triggering significant downstream costs to the City and its partner agencies, including 988 crisis calls, mobile crisis response, emergency room visits, ambulance rides (which are generally reimbursed far below cost of service by Medicaid), and crisis stabilization stays at facilities like Thresholds Living Room. These avoidable public expenses far exceed the cost of a hotel voucher;

- Under the ADA, the City cannot deny a reasonable accommodation unless it would be an undue burden or fundamental alteration. Given that the cost of a hotel voucher is de minimis relative to the City's overall shelter and emergency services budget—and that denying the accommodation predictably results in greater public expenditure—the City's refusal is not merely unreasonable; it is fiscally irrational and legally indefensible.

57. Defendant's 311 shelter-request system is procedurally inaccessible to individuals with sensory, trauma-based, or communication-related disabilities. The system provides no way to request a reasonable accommodation, no method for submitting provider documentation, and no process for follow-up, review, or tracking of disability-related needs. Callers receive no advance notice of transportation, no information about the placement environment, and no written confirmation of any offer, making it impossible for individuals who require predictable transitions or sensory-safe settings to assess whether a placement is medically appropriate. The system also offers no alternative intake pathway—such as an online form, text-based option, or ADA-compliant in-person process—for individuals who cannot safely use the phone due to sensory overload or trauma symptoms. As a result, disabled residents are treated identically to nondisabled callers and are denied meaningful access to the City's emergency shelter programs.

58. As detailed in Paragraph 34, the system also erases accommodation-related information when a service request is reactivated, reverting to only the original, incomplete intake data. No alternative intake pathway exists for individuals whose disabilities prevent them from navigating the standard 311 phone process. This constitutes a failure to make reasonable modifications to policies, practices, and procedures in violation of the ADA and Section 504 of the Rehabilitation Act.

59. Definitional Evasion of "Non-Congregate" and Constructive Denial: Defendant has adopted an internal definition of "non-congregate" that includes shared rooms with shared bathrooms, which does not meet the medical needs of individuals with sensory processing disorders. This definition directly conflicts with IHDA and HUD definitions of non-congregate shelter, which require private rooms and private sanitary facilities. By

offering a placement the City knew was medically contraindicated based on the documentation provided, Defendant committed a constructive denial of a reasonable accommodation.

60. Violation of City's Own Tier II Hospital Discharge Guidelines: Defendant failed to comply with its own September 2025 Tier II Hospital Discharge Guidelines, which prohibit discharging individuals into City-funded congregate shelters when they cannot safely manage Activities of Daily Living (ADLs) even with reasonable accommodations. Plaintiff's medical documentation made clear that no reasonable accommodation could make a congregate environment safe for her because the environment itself—crowded, noisy, unpredictable, and lacking private bathroom access—was medically contraindicated. By directing Plaintiff to congregate shelters and waiting rooms despite this known risk, Defendant disregarded its own discharge standards and created a practice of placing individuals with sensory-based disabilities into settings where ADLs cannot be safely performed. This constitutes a systemic failure to provide meaningful access and reflects deliberate indifference to the needs of disabled residents.

61. De Facto Exclusion of a Protected Class: By maintaining zero or near-zero inventory of private, sensory-accessible shelter beds while funding thousands of congregate beds, Defendant has effectively excluded individuals with sensory disabilities from its emergency shelter program. This policy has a disparate impact on autistic individuals and others with sensory processing disorders.

62. *Olmstead* Violation: Defendant's failure to provide community-based, integrated shelter options has resulted in the attempted institutionalization of Plaintiff in a group home

setting, in violation of the *Olmstead v. L.C.* integration mandate in the least restrictive environment on April 9th, 2026.

63. **Retaliation:** Defendant, through its delegate agency SGA, terminated Plaintiff's shelter placement in retaliation for Plaintiff's protected activity, including requesting reasonable accommodations and asserting her rights under the ADA and Section 504. Such retaliation violates 42 U.S.C. § 12203(a) and Section 504 of the Rehabilitation Act. Although SGA later withdrew the termination after Plaintiff served an emergency TRO motion to Corporate Counsel, it is still planning to exit her from the program on June 26th, 2026 while her non-disabled peers get renewals.

64. SGA routinely exercises discretion to extend stays beyond 60 days for other residents. Plaintiff has personal knowledge that SGA has extended the hotel stays of multiple other residents well beyond the stated 60-day limit, with some staying over six months. SGA exercises this discretion regularly. In contrast, when Plaintiff informed SGA that she needed an extension to complete her housing process and requested reasonable accommodations for her disability, SGA issued a retaliatory termination notice and has not offered any extension. This disparate treatment – granting extensions to non-disabled residents while denying one to a disabled resident who requested accommodations – further demonstrates retaliation and discrimination in violation of the ADA and Section 504.

VI. PRAYER FOR RELIEF

Plaintiff respectfully requests that the court order:

## A. Individual Relief for Plaintiff Jessica Jamie Lehman

65. Issue a finding of substantial evidence that Defendant has engaged in unlawful discrimination under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

66. Award Plaintiff compensatory damages in an amount sufficient to reimburse her for:

   a. All out-of-pocket hotel expenses incurred due to the City's failure to provide a reasonable accommodation;

   b. All medical expenses related to the preventable psychiatric crises and ER visits;

67. Award any additional damages or relief the Court determines is appropriate and permitted by law. .

## B. Systemic Relief for All Similarly Situated Individuals

68. **Declaratory Ruling:** Issue a declaratory ruling that Defendant's current shelter policies and practices—including its inaccessible 311 intake system, its lack of an interactive process, its definitional distortion of "non-congregate" shelter, and its failure to maintain a sensory-accessible shelter inventory—violates Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

69. **Structural Reform Order:** Plaintiff requests that, upon a finding of substantial evidence, the court order defendant to implement the following system-wide accessibility improvements to ensure meaningful access for all individuals with disabilities, including but not limited to those with sensory processing disabilities (such as Autism Spectrum Disorder), trauma-related disabilities, survivors of domestic or gender-based violence, individuals who are immunocompromised or medically vulnerable, and any person

whose disability necessitates private, low-stimulus, medically appropriate, or otherwise similarly modified shelter accommodations.

**a. Phased Implementation of Sensory-Safe Micro-Rooms**

a. Defendant shall implement a phased, demand-responsive system for providing individualized sensory-safe micro-rooms within existing shelter facilities. Upon a self-attestation of a disability-related need for a sensory-safe or isolated sleeping space, Defendant shall convert existing shelter floor space to create a compliant micro-room within 24 hours of the resident's attestation.

b. Capacity Benchmarks and Conditional Expansion (Flex Inventory): Defendant shall maintain a system-wide flex inventory of movable partitions, lighting, and related equipment sufficient to meet real-time demand. The system shall operate under the following phased and conditional capacity requirements:

   i. **Year 1:** Defendant shall maintain flex capacity sufficient to support at least 500 sensory-safe micro-rooms.

   ii. **Conditional Doubling Rule (Year 2–Onward):** If the existing flex capacity reaches 90% utilization on at least 30 days in a calendar year, Defendant shall double the flex capacity during the following calendar year. This conditional doubling shall continue only when full utilization occurs, and only until flex capacity equals or exceeds 15% of total City shelter bed capacity. **Once flex capacity equals or exceeds 15% of total City shelter bed capacity, Defendant shall maintain capacity at or above this level on a permanent basis.**

      iii. These benchmarks define minimum system capacity, not quotas. Defendant shall convert space whenever requested by an eligible resident, up to the limits of the flex inventory required above.

**c. Minimum Specifications for Each Micro-Room**

Each micro-room shall provide the resident with four full walls forming an enclosed personal sleeping space containing a bed or sleeping mat.

      i. Walls shall be constructed using movable acoustic room dividers, mobile acoustic partitions, or freestanding acoustic privacy panels.

      ii. All walls must be at least six feet high.

      iii. An entrance/exit opening is permitted, but no more than half of one wall may be open.

      iv. Curtains, fabric screens, half-screens, or any non-rigid or partial dividers do not satisfy this requirement.

**d. Lighting Control (Light-Sensitivity Accommodation)**

Each micro-room shall include resident-controlled, dimmable lighting, such as LED smart lamps or portable dimmers.

      i. Overhead fluorescent or fixed on/off lighting within the micro-room area shall be turned off or bypassed.

      ii. Lighting must allow residents to regulate brightness and avoid glare consistent with sensory-based light-sensitivity needs.

**e. Sensory Regulation Tools**

Each micro-room shall include:

      i. Over-the-ear, non-electronic noise-canceling headphones;

    ii.  A disposable sleeping mask;

    iii.  Fidgets, upon request.

**f.  Access and Predictability**

    i.  Residents shall have 24/7 access to their micro-room, except for reasonable cleaning or maintenance periods.

    ii.  Access shall be provided via staff- or resident-controlled key cards, ensuring predictable, uninterrupted availability.

    iii.  A resident's micro-room accommodation shall not be revoked or deemed forfeited due to a missed night or temporary absence.

**b. DFSS Reasonable Accommodation Request Form**

g.  The City shall provide a simple online form on the DFSS website where individuals — as well as providers or institutions acting on their behalf — may request disability-related reasonable accommodations from the City. The form should allow users to briefly describe their accommodation needs and, if they choose, upload supporting documentation. It must be accessible to screen readers, easy to complete on a phone or computer, and publicly searchable so that disabled clients can locate it without barriers.

h.  Once submitted, DFSS will review the request and make a determination. The purpose of this form is to give disabled clients a clear, straightforward way to access the interactive process and request accommodations without requiring phone calls, in-person visits, or repeated disclosures. This keeps the process simple, low-cost, and consistent for both the City and the public.

**c. Sensory-Safe Quiet Room at SPARC**

    i. Convert a dedicated, unused space at SPARC into a sensory-safe quiet room for trauma-informed crisis stabilization available **24/7**.

    j. The room shall be a no-talking, low-stimulation environment equipped with acoustic panels, dimmable lighting, and decompression tools to reduce avoidable emergency room transfers and police involvement.

**d. Equal Access to Non-Congregate Placements**

The City shall not restrict hotel-based, private-room non-congregate placements exclusively to survivors of domestic violence or gender-based violence. Such placements shall be made available to individuals with disabilities on the same terms and through the same process, including the DFSS reasonable accommodation request form described in subsection (b). The City shall not require a disability-based applicant to reclassify as a DV/GBV survivor to access a hotel placement, and shall maintain a sufficient inventory of non-congregate hotel rooms to meet the needs of disabled residents who require such placements as a reasonable accommodation.

70. **Procedural and Policy Reforms:** Order the following systemic modifications

    a. **311/CES Data Integrity:** Add distinct data fields and flags for sensory disability and accommodation tracking. Prohibit the erasure of accommodation-related information when a service request is reactivated.

    b. **Communication and Transportation Reform:**

        i. Provide **advance written notification** (text or email) of the specific shelter name, address, and sleeping arrangement type to the client before

transportation is dispatched. If the city or delegate agency does not have client's contact information, they will alert the requesting agency.

ii. Provide at least 15 minutes of **advance notification** (text, call, or email) to the client before transportation departments. If the city or delegate agency does not have client's contact information, they will alert the requesting agency instead.

iii. Maintain a **minimum 60-minute callback window** before forfeiting a shelter placement.

iv. Prohibit directing individuals with documented sensory disabilities to congregate waiting areas without providing an alternative sensory-safe waiting space.

v. Require that all placement offers be **confirmed in writing** upon request.

c. **Training:** Implement mandatory training for all 311, DFSS, SPARC, and delegate agency staff on sensory processing disorders, ASD, trauma-informed care, and IHRA compliance.

d. **Tier II Enforcement:** Establish a binding monitoring and enforcement mechanism to ensure hospitals are given the resources to ensure compliance with the September 2025 Tier II Hospital Discharge Guidelines.

71. **Retention of Jurisdiction:** Retain jurisdiction over this matter to ensure compliance with all ordered systemic and structural relief.

---

## VII. VERIFICATION

I, Jessica Jamie Lehman, declare under penalty of perjury that I have read the foregoing document and that the facts stated therein are true and correct to the best of my knowledge, information, and belief.

Dated: June 18th, 2026

/s/ Jessica Jamie Lehman

Respectfully submitted,

/s/ Jessica Jamie Lehman

Address: Confidential (Sealed Address Sheet Attached Under LR 5.7)

Chicago, IL 60612

Phone: (317) 450-9525

Email: jessica@jessicaj.studio

Plaintiff, Pro Se

VIII. CERTIFICATE OF SERVICE

I certify that I will serve the Defendant, the City of Chicago, through the United States Marshals Service after the Court rules on my application to proceed in forma pauperis and issues summons pursuant to Federal Rule of Civil Procedure 4(c)(3). No service has yet been made.

**Defendant's Service Address:**

Mayor of the City of Chicago

121 N. LaSalle Street, Chicago City Hall, 4th Floor

Chicago, IL 60602

Dated: June $th, 2026

/s/ Jessica Jamie Lehman

---

Attachments (Exhibits):

- **Exhibit A – Letter from Dr. Paula Mathewson, MD (April 2, 2026)**

  Psychiatrist's documentation of Plaintiff's diagnoses, sensory-based limitations, and medical necessity of a private, non-congregate, sensory-controlled environment; along with other necessary accommodations.

- **Exhibit B – 311 Work Order Summary for Service Request SR26-00636635 (Provided to Plaintiff on April 20, 2026)**

  A copy of the City of Chicago's 311 Work Order Summary for Service Request SR26-00636635, which was handed to Plaintiff by A Safe Haven staff on April 20, 2026

during an attempted placement that was falsely described as "non-congregate." The document shows that the information contained in the SR was unchanged from the original April 8, 2026 hospital submission and consisted only of the brief notation: *"Jessica-Jamie is special needs, she's autistic."* No disability-related accommodation information, medical documentation, or updates from DFSS or Plaintiff's attorney were included. This exhibit demonstrates that the City's system failed to record, retain, or transmit Plaintiff's documented sensory-based disability needs, and that the reactivated SR contained none of the accommodation information previously provided—resulting in repeated misrouting and the constructive denial of any ADA-compliant interactive process.

- **Exhibit C – Email Correspondence with Attorney Kyle Voils (April 17–21, 2026)**

Email communications between Plaintiff's attorney, Kyle Voils, and DFSS confirming that the City had received Plaintiff's medical documentation, acknowledged her disability-related need for a private, non-congregate placement, and represented that such a placement was available. The correspondence further shows that DFSS failed to notify counsel of the April 20 misrouting to a congregate shelter, admitted on April 21 that no private or sensory-safe placements were actually available anywhere in the system, and instructed that Plaintiff would need to restart the 311 process for a fourth time. These communications demonstrate DFSS's knowledge of Plaintiff's disability needs, its inability to provide an ADA-compliant placement, and the non-existence of the interactive process.

- **Exhibit D – City of Chicago Tier II Hospital Discharge Guidelines (September 2025) (Excerpts)**

  Excerpts from the City of Chicago's Tier II Hospital Discharge Guidelines, jointly issued by DFSS and CDPH, stating that individuals who are in an acute mental health episode, unable to perform Activities of Daily Living (ADLs) safely even with reasonable accommodations, or unable to remain safe in congregate environments cannot be discharged to City-funded shelters, DFSS Community Service Centers, or the SPARC. The Guidelines require hospitals and the City to place such individuals in higher-level, non-congregate settings such as medical respite or supportive living facilities. These excerpts demonstrate that the City's own written policy prohibits discharging individuals with Plaintiff's documented sensory-based and trauma-based disabilities into congregate shelters, yet the City provided no functional Tier II-appropriate alternative that does not result in unnecessary institutionalization.

- **Exhibit E – Plaintiff's "UNSWORN DECLARATION OF JESSICA JAMIE LEHMAN UNDER PENALTY OF PERJURY" Regarding Thresholds Disclosure**

  An unsworn declaration under penalty of perjury from Plaintiff describing the May 29, 2026 phone calls in which Thresholds staff confirmed to SGA that they already possessed the hotel address through their internal system and had disclosed it to themselves, not Plaintiff. The declaration further states that Thresholds immediately contacted SGA's case manager to confirm this directly, contradicting SGA's stated basis for termination.

- **Exhibit F – Audio Recording of May 29, 2026 Phone Call with SGA Program Therapist Georganne Struss (Post-Termination Call; Authenticated by Plaintiff)**

An audio recording of Plaintiff's May 29, 2026 phone call with SGA program therapist Georganne Struss, made after SGA case manager Sianny Munroe had already sent Plaintiff the written termination notice via text message. The recording captures SGA acknowledging that Plaintiff informed them on May 28 that she intended to request disability accommodations, refusing to discuss the matter by phone despite Plaintiff stating she was in a panic attack, insisting on an immediate in-person confrontation, and characterizing the situation as a "serious breach" before gathering any facts. The recording further reflects SGA's refusal to engage in the ADA interactive process and its escalation of Plaintiff's psychiatric distress. The audio file is hosted at a timestamped public Google Drive link below and is authenticated by Plaintiff's accompanying declaration:

https://drive.google.com/file/d/1NwviosFqu6Pn_6AwYfZQDg6yBmz8_FVF/view?usp=share_link

- **Exhibit G – Communications with Sianny Munroe (SGA Case Manager)**

Emails and text messages including:

• Email where Plaintiff informed SGA of disability-related housing needs, with psychiatrist's letter attached in "Reasonable Accommodation Packet" to email. This is evidence SGA knew Plaintiff required sensory-safe meeting spaces

• Texts confirming program discharge attempt.

• Confirmation that the nighttime visitor resulted from SGA's misrouting, not Plaintiff's misconduct

- **Exhibit H – SGA Correspondence After Reversed Termination Attempt  (June 1–16, 2026)**

  Includes: (1) Warning Letter dated June 1, 2026 (alleging confidentiality breach and failure to check out); (2) Expectation Letter dated June 5, 2026 (establishing rules for off-site meetings); and (3) In/Out Sheet requirement dated June 12, 2026 (demonstrating Plaintiff's compliance with check-in/out procedures), and additional emails contradicting prior instructions and ignoring disability needs. These documents show inconsistent enforcement, retroactive rule-making, failure to engage in the interactive process, and ongoing retaliation.

- **Exhibit I – Plaintiff's ADA Accommodation Request to DFSS (June 6, 2026) and Fax Confirmation**

  A copy of Plaintiff's formal reasonable accommodation request transmitted to the Chicago Department of Family & Support Services, including Fax Confirmation report.

- **Exhibit J – City of Chicago Notice of Nondiscrimination and Grievance Procedure (printed from City website on June 13, 2026)**

  Copies of the City's official ADA/Rehabilitation Act notice and grievance procedure directly from their website, showing the promise of reasonable modifications and the lack of any DFSS-specific ADA process.



**ESKENAZI HEALTH**

Eskenazi Health
720 Eskenazi Ave.
Indianapolis, IN 46202
317.880.0000
EskenaziHealth.edu

# EXHIBIT A

To Whom it may concern,                                        4/2/2026

I am writing this supplemental letter on behalf of my client, Jessica Lehman, whom I have treated at the Sandra Eskenazi Mental Health Center since August 14, 2023. This letter is intended to provide additional clinical documentation regarding disability-related functional limitations and medically necessary environmental accommodations relevant to shelter placement, hospital discharge planning, and supportive housing eligibility.

Jessica carries the following psychiatric diagnoses: Autism Spectrum Disorder (ASD), Major Depressive Disorder (MDD), Posttraumatic Stress Disorder (PTSD), and Borderline Personality Disorder (BPD). These conditions significantly impair her functioning across social, occupational, and daily living domains, as previously documented. The following information expands upon specific sensory, mobility, and environmental needs that are medically necessary in a shelter or transitional housing environment to ensure Jessica's safety and psychiatric stability.

**Sensory and Environmental Limitations**
Due to Autism Spectrum Disorder and trauma-related symptoms, Jessica experiences severe sensory overstimulation in crowded, noisy, or unpredictable environments. These episodes can result in acute anxiety, agitation, dissociation, shutdowns, or meltdowns requiring prolonged periods of isolation to recover. For this reason, congregate shelter settings are medically unsafe for Jessica and would predictably result in psychiatric destabilization.

Jessica requires access to a private or sensory-controlled sleeping environment to regulate sensory input, prevent overstimulation, and maintain psychiatric stability. This includes the ability to use noise-canceling headphones, her phone, and related assistive devices at all times for sensory regulation and emergency communication.

Jessica also requires unrestricted access to her sleeping and living space, or another sensory-safe equivalent (such as a quiet room) as her sleep schedule is significantly impacted by MDD and may not align with standard curfew or lockout times. Denial of access to her room or an equivalent space during periods of dysregulation or fatigue would exacerbate symptoms and impair her ability to function.

**Need for Predictable Transitions**
Jessica's ASD and trauma history make sudden environmental changes medically destabilizing. Unpredictable transitions can trigger sensory overload, emotional dysregulation, and depressive symptoms. For this reason, predictable transitions and

# EXHIBIT A

advance notice of any placement changes are medically necessary to maintain her psychiatric stability.

**Clinical Recommendation**
Based on the above functional limitations, it is my clinical opinion that Jessica requires:

- Placement in a non-congregate, private, or sensory-controlled environment
- Disability-related accommodations for mobility, sensory regulation, and psychiatric stability
- Housing located near accessible public transit
- Limited in-person case management requirements
- Access to assistive devices for sensory regulation
- Predictable transitions and advance notice of environmental changes

These accommodations are medically necessary to prevent psychiatric deterioration, reduce risk of crisis, and ensure Jessica's ability to safely access shelter and housing services.

Please feel free to contact me if further information is needed.

Thank you,

Dr. Paula Mathewson, MD
Psychiatrist – Mood Clinic
317-880-8491

## EXHIBIT B



# EXHIBIT C



From: **Kyle Voils** kyle@chicagohomeless.org
Subject: Re: Incorrect Congregate Routing and 311 Re-Activation – Request for DFSS Confirmation
Date: April 20, 2026 at 4:38 PM
To: Jessica Lehman jessica.j.lehman@icloud.com

Hi Jessica,

I heard back from DFSS. They said that the room that you were offered today was "non-congregate" but shared with another person. Apparently their conception of "non-congregate" does not mean a private individual room, which I know does not track with our common understanding of "non-congregate." I am sorry that I do not have better news to share with you.

I asked if there were private, non-shared room options available that could accommodate your needs based on your disabilities and experiences with gender-based violence, and they said that there are no non-shared rooms available at this time. They said that while the shared room from today is no longer available, they will continue to check the other two "non-congregate" shelters and that you would be a priority for being placed there. Based on your experience today, though, I cannot guarantee that any placement that they offer to you at another "non-congregate" shelter will be in a private room not shared with another person.

At this point, I think it would make sense for me to share this experience with Lauren and Equip for Equality, as I think it is relevant to the reasonable accommodation considerations that you were discussing with them. Do I have your permission to share this information with them?

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**




Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

# EXHIBIT C

From: **Jessica Lehman** jessica.j.lehman@icloud.com  📎
Subject: Re: Connecting you with the Chicago Coalition to End Homelessness
Date: April 20, 2026 at 11:08 AM
To: Kyle Voils kyle@chicagohomeless.org



Hey Kyle,

I have not received any communications yet from Chicago DFSS, nor had an opportunity to update my pickup address. Please keep me posted as things develop!

- Jessica Lehman (she/her)
(317) 450-9525

On Apr 20, 2026, at 10:51 AM, Kyle Voils <kyle@chicagohomeless.org> wrote:

Good morning, Jessica,

I was told just a few minutes ago that a non-congregate space has come available and that you are being placed there. I just wanted to check in and see if you have received any communication regarding that placement this morning?

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct: 312.973.6106 | Main: 312.641.4140**
**Law Project of the Chicago Coalition to End Homelessness**

[O] [f] [in] X [butterfly]





Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

From: Kyle Voils <kyle@chicagohomeless.org>
Sent: Friday, April 17, 2026 5:18 PM
To: Jessica Lehman <jessica.j.lehman@icloud.com>
Subject: Re: Connecting you with the Chicago Coalition to End Homelessness

Hi Jessica!

Thanks for talking with me just a bit ago. I am really sorry for the hardships that you have endured trying to get shelter here in Chicago. As we discussed, we are not able to provide legal representation to you currently. However, after our call and just

# EXHIBIT C

able to provide legal representation to you currently. However, after our call and just before the close of business I emailed a contact at DFSS requesting assistance with getting you a non-congregate emergency shelter placement. With your permission, I also shared that you need a non-congregate placement because you are a person with disabilities including autism and a survivor of gender-based violence. I also flagged your SR number and phone number for them, and clarified that the pickup address associated with your SR number would need to be updated if you were to be referred and have a pickup. They may contact you directly, but if they contact me with information about a placement, I will contact you promptly in turn.

You and I also discussed that I had been in touch with another agency who had a possible apartment referral through the Chicago Low Income Housing Trust Fund program. You indicated that you did not want me to connect you with that agency for that referral because you have another promising lead for being connected to housing with a subsidy after your emergency situation. You also clarified for me that you are not currently receiving SSI. Just for your reference, I want to let you know that if you were connected to that apartment that I mentioned, to qualify you would have to provide documents including a photo ID, a social security card, birth certificate, proof of income (like paystubs or an SSI award letter), and your last 4-6 bank statements. Again, I know that you do not want me to take any action related to that connection, but I just wanted to be sure that I shared with you some of the information that I was able to gather after talking with Lauren, just so you are in the loop about what I learned.

I want to express again that I am very sorry for the negative experiences you've had trying to access shelter here in Chicago. I will be sure to follow up with any additional information that I learn.

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**





**Housing is a human right.**

Chicago
Coalition to end
Homelessness

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is

# EXHIBIT C

prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Kyle Voils <kyle@chicagohomeless.org>
**Sent:** Friday, April 17, 2026 4:27 PM
**To:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness

Hi Jessica!

Yes, I am able to give you a call in just a minute. I will be calling from 312-973-6106.

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct: 312.973.6106 | Main: 312.641.4140**
**Law Project of the Chicago Coalition to End Homelessness**





Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Sent:** Friday, April 17, 2026 4:17 PM
**To:** Kyle Voils <kyle@chicagohomeless.org>
**Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness

Hi Kyle,

Thank you so much for agreeing to help. I know it's late in the work day, but I'd greatly appreciate if you could try to give me a call or text at (317) 450-9525 before the end of the workday if at all possible! **Lauren said you might have some emergency ideas to help me get through the weekend.**

I'm dealing with a gap in sensory safe shelter for this weekend as a 23-year-old autistic transgender woman. I've attached to this reply all relevant documents, including:
1. My Ready-To-Go Legal Memorandum and Case Analysis
2. My documents including letters from my psychiatrist saying why traditional shelters are unsafe for me especially with sensory.
3. Evidence of my work as a Legal Researcher helping spark the Orr v. Trump case, helping demonstrate why I cannot return safely to Indiana.

Thanks so much,
Jessica Lehman (she/her)

# EXHIBIT C

On Apr 17, 2026, at 4:11 PM, Lauren Galloway <LaurenG@equipforequality.org> wrote:

Hi Jessica,

It was nice talking with you today! As we discussed, I wanted to connect you with Kyle Voils with the Chicago Coalition to End Homelessness. Kyle is great and may be able to offer some additional support regarding your immediate need for shelter.

We thought it might be easiest for the two of you to connect directly, and I've CC'ed Kyle here so that the two of you can coordinate follow up.

Wishing you the very best,

Lauren

Lauren Galloway
Staff Attorney
Illinois ADA Project, Manager
Equip for Equality, Inc.
20 N. Michigan Avenue, Suite 300
Chicago, IL 60602

The information contained in this email message and in any attachments constitutes confidential information that belongs to Equip for Equality, Inc. This email and attachments may also contain attorney work product or information protected by the attorney-client privilege or other privileges. This information is intended only for the use of the individual or entity to which it is directed. If you are not the intended recipient, you are hereby notified that any disclosure or reliance on this information is prohibited. If you have received this message in error, please notify us at 800-537-2632 (voice) or 800-610-2779 (TTY). Thank you.

# EXHIBIT C

**From:** **Jessica Lehman** jessica.j.lehman@icloud.com  📎
**Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness
**Date:** April 20, 2026 at 11:08 AM
**To:** Kyle Voils kyle@chicagohomeless.org



Hey Kyle,

I have not received any communications yet from Chicago DFSS, nor had an opportunity to update my pickup address. Please keep me posted as things develop!

- Jessica Lehman (she/her)
(317) 450-9525

> On Apr 20, 2026, at 10:51 AM, Kyle Voils <kyle@chicagohomeless.org> wrote:
>
> Good morning, Jessica,
>
> I was told just a few minutes ago that a non-congregate space has come available and that you are being placed there. I just wanted to check in and see if you have received any communication regarding that placement this morning?
>
> Sincerely,
>
> Kyle
>
> **Kyle Voils** | Senior Attorney
> he/him/his _(Why do pronouns matter?)_
> **Direct:** 312.973.6106 | **Main:** 312.641.4140
> **Law Project of the Chicago Coalition to End Homelessness**
>
>
>
>
>
> Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.
>
> ---
>
> **From:** Kyle Voils <kyle@chicagohomeless.org>
> **Sent:** Friday, April 17, 2026 5:18 PM
> **To:** Jessica Lehman <jessica.j.lehman@icloud.com>
> **Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness
>
> Hi Jessica!
>
> Thanks for talking with me just a bit ago. I am really sorry for the hardships that you have endured trying to get shelter here in Chicago. As we discussed, we are not able to provide legal representation to you currently. However, after our call and just

# EXHIBIT C

able to provide legal representation to you currently. However, after our call and just before the close of business I emailed a contact at DFSS requesting assistance with getting you a non-congregate emergency shelter placement. With your permission, I also shared that you need a non-congregate placement because you are a person with disabilities including autism and a survivor of gender-based violence. I also flagged your SR number and phone number for them, and clarified that the pickup address associated with your SR number would need to be updated if you were to be referred and have a pickup. They may contact you directly, but if they contact me with information about a placement, I will contact you promptly in turn.

You and I also discussed that I had been in touch with another agency who had a possible apartment referral through the Chicago Low Income Housing Trust Fund program. You indicated that you did not want me to connect you with that agency for that referral because you have another promising lead for being connected to housing with a subsidy after your emergency situation. You also clarified for me that you are not currently receiving SSI. Just for your reference, I want to let you know that if you were connected to that apartment that I mentioned, to qualify you would have to provide documents including a photo ID, a social security card, birth certificate, proof of income (like paystubs or an SSI award letter), and your last 4-6 bank statements. Again, I know that you do not want me to take any action related to that connection, but I just wanted to be sure that I shared with you some of the information that I was able to gather after talking with Lauren, just so you are in the loop about what I learned.

I want to express again that I am very sorry for the negative experiences you've had trying to access shelter here in Chicago. I will be sure to follow up with any additional information that I learn.

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**





Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is

# EXHIBIT C

prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Kyle Voils <kyle@chicagohomeless.org>
**Sent:** Friday, April 17, 2026 4:27 PM
**To:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness

Hi Jessica!

Yes, I am able to give you a call in just a minute. I will be calling from 312-973-6106.

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**





Housing is a human right. Chicago Coalition to end Homelessness

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Sent:** Friday, April 17, 2026 4:17 PM
**To:** Kyle Voils <kyle@chicagohomeless.org>
**Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness

Hi Kyle,

Thank you so much for agreeing to help. I know it's late in the work day, but I'd greatly appreciate if you could try to give me a call or text at (317) 450-9525 before the end of the workday if at all possible! **Lauren said you might have some emergency ideas to help me get through the weekend.**

I'm dealing with a gap in sensory safe shelter for this weekend as a 23-year-old autistic transgender woman. I've attached to this reply all relevant documents, including:
1. My Ready-To-Go Legal Memorandum and Case Analysis
2. My documents including letters from my psychiatrist saying why traditional shelters are unsafe for me especially with sensory.
3. Evidence of my work as a Legal Researcher helping spark the Orr v. Trump case, helping demonstrate why I cannot return safely to Indiana.

Thanks so much,
Jessica Lehman (she/her)

# EXHIBIT C

On Apr 17, 2026, at 4:11 PM, Lauren Galloway <LaurenG@equipforequality.org> wrote:

Hi Jessica,

It was nice talking with you today! As we discussed, I wanted to connect you with Kyle Voils with the Chicago Coalition to End Homelessness. Kyle is great and may be able to offer some additional support regarding your immediate need for shelter.

We thought it might be easiest for the two of you to connect directly, and I've CC'ed Kyle here so that the two of you can coordinate follow up.

Wishing you the very best,

Lauren

Lauren Galloway
Staff Attorney
Illinois ADA Project, Manager
Equip for Equality, Inc.
20 N. Michigan Avenue, Suite 300
Chicago, IL 60602

The information contained in this email message and in any attachments constitutes confidential information that belongs to Equip for Equality, Inc. This email and attachments may also contain attorney work product or information protected by the attorney-client privilege or other privileges. This information is intended only for the use of the individual or entity to which it is directed. If you are not the intended recipient, you are hereby notified that any disclosure or reliance on this information is prohibited. If you have received this message in error, please notify us at 800-537-2632 (voice) or 800-610-2779 (TTY). Thank you.

# EXHIBIT C

**From:** Kyle Voils kyle@chicagohomeless.org
**Subject:** Re: Incorrect Congregate Routing and 311 Re-Activation – Request for DFSS Confirmation
**Date:** April 21, 2026 at 8:37 AM
**To:** Jessica Lehman jessica.j.lehman@icloud.com



Good morning, Jessica,

I appreciate you following up with me. I will be sure to follow up with Lauren today.

Do you have time to talk on the phone at 9am today? I know it is short notice, but I am hoping that we can briefly discuss the shelter options from yesterday.

Sincerely,

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct: 312.973.6106 | Main: 312.641.4140**
**Law Project of the Chicago Coalition to End Homelessness**





Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Sent:** Monday, April 20, 2026 7:39 PM
**To:** Kyle Voils <kyle@chicagohomeless.org>
**Subject:** Re: Incorrect Congregate Routing and 311 Re-Activation – Request for DFSS Confirmation

Hi Kyle,

Apologies for the third email this evening, but I believe I had a breakthrough that may help frame the narrative of this situation more clearly for Lauren when you reach out tomorrow.

After today's events, I realized that what happened with the placement isn't just a one-off mistake — it fits a larger pattern that may explain why DFSS keeps offering placements that contradict my disability tags and your communications. What I believe I noticed aligns with a broader post-COVID trend in city budgets nationwide, where hotel-based placements were significantly reduced after the emergency period.

It appears that the city may have significantly reduced or eliminated hotel-based placements after COVID, likely due to the extremely high hotel expenditures during the emergency period. What I experienced today looks like a post-crisis overcorrection: a shift toward avoiding hotel placements entirely, even when disability accommodations would normally require them. This would explain why "non-congregate" is being stretched to include shared rooms and why exceptions aren't being made despite clear documentation.

If this is correct, it means the barrier I ran into today isn't just a miscommunication — it's a structural gap that disproportionately affects people with sensory disabilities who require private rooms. And DFSS effectively acknowledged that gap on record.

I thought this framing might be helpful context for Lauren, since it connects the individual placement failure to a broader systemic issue.

Thank you again for everything throughout all of this,

# EXHIBIT C

Jessica Lehman (she/her)
(317) 450-9525

Thanks so much,
Jessica Lehman (she/her)

> On Apr 20, 2026, at 4:59 PM, Jessica Lehman <jessica.j.lehman@icloud.com> wrote:
>
> A quick update and a question:
> 1. At 4:47 PM on April 20, 2026, Ian from A Safe Haven Foundation called to offer a shelter placement; after confirming through my attorney's communication with DFSS that the room was a shared space and therefore not appropriate for my ADA/IHRA sensory disability needs or my documented gender-based violence history, I declined the placement on the phone and stated the reason for refusal. Ian told me to reach out if I need shelter placement again.
> 2. Would you be able to forward me a copy of your correspondence with your contact at Chicago DFSS? I want to have for my records them confirming no non-shared rooms at this time and everything else they said in case Lauren can't handle it and I need to go to an attorney or go pro se.
>
> Thank you again,
> Jessica Lehman
> (317) 450-9525
>
> > On Apr 20, 2026, at 4:38 PM, Kyle Voils <kyle@chicagohomeless.org> wrote:
> >
> > Hi Jessica,
> >
> > I heard back from DFSS. They said that the room that you were offered today was "non-congregate" but shared with another person. Apparently their conception of "non-congregate" does not mean a private individual room, which I know does not track with our common understanding of "non-congregate." I am sorry that I do not have better news to share with you.
> >
> > I asked if there were private, non-shared room options available that could accommodate your needs based on your disabilities and experiences with gender-based violence, and they said that there are no non-shared rooms available at this time. They said that while the shared room from today is no longer available, they will continue to check the other two "non-congregate" shelters and that you would be a priority for being placed there. Based on your experience today, though, I cannot guarantee that any placement that they offer to you at another "non-congregate" shelter will be in a private room not shared with another person.
> >
> > At this point, I think it would make sense for me to share this experience with Lauren and Equip for Equality, as I think it is relevant to the reasonable accommodation considerations that you were discussing with them. Do I have your permission to share this information with them?
> >
> > Sincerely,

# EXHIBIT C

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Kyle Voils <kyle@chicagohomeless.org>
**Sent:** Monday, April 20, 2026 3:45 PM
**To:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Subject:** Re: Incorrect Congregate Routing and 311 Re-Activation – Request for DFSS Confirmation

Hi Jessica,

Thank you for following up with me via e-mail also. I am sorry that things did not go correctly with A Safe Haven and your placement at Primo. I will reach out again to DFSS via email now and see if they can try to resolve this issue for you. I will let you know if I receive any additional information.

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**

# EXHIBIT C

## <Outlook-A blue sig.png>

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Sent:** Monday, April 20, 2026 3:26 PM
**To:** Kyle Voils <kyle@chicagohomeless.org>
**Subject:** Incorrect Congregate Routing and 311 Re-Activation – Request for DFSS Confirmation

Hi Kyle,

I wanted to update you immediately because something appears to have gone wrong in the system, and I need DFSS to confirm the correct next steps. I also left you a voicemail, but this email contains more information.

Earlier today, I received a call from **A Safe Haven Foundation.** The staff member told me I had been assigned to the **Primo Center at 6212 S. Sangamon (the congregate women's triage section).** This was surprising and concerning because DFSS had already informed you that a **non-congregate placement had been secured.**

To understand what was happening, I went in person to the address they directed me to come first to "fill out paperwork" (thought it may have just been a placeholder): **A Safe Haven's office at Suite 128, 10 S. Kedzie.** The document shows that my **311 SR number was re-activated** with it only containing the limited information the hospital originally sent (that I am autistic with sensory issues). **It does _not_ reflect the ADA accommodations, safety concerns, or the non-congregate placement request you submitted.** They provided me with a copy of the printed document verifying all this, which I've attached.

It appears the system mistakenly treated me as a standard congregate referral again, despite DFSS confirming earlier that a non-congregate space had been identified for me.

Could you please:

- Confirm with DFSS what the **actual placement** is supposed to be,

- Clarify why my SR number was re-activated and routed into the congregate system again,

- Make sure that they still intend to contact me directly at my (317) 450-9525 number when they are ready.

  And if at all possible, let me know who will be contacting me and who I should reach out to at Chicago DFSS with any questions if applicable.

# EXHIBIT C

I'm concerned about being placed incorrectly again, so any clarification or follow-up you can provide with DFSS would be extremely helpful.

Thank you again for all of your help.

Jessica Lehman (she/her)

(317) 450-9525

On Apr 20, 2026, at 10:51 AM, Kyle Voils <kyle@chicagohomeless.org> wrote:

Good morning, Jessica,

I was told just a few minutes ago that a non-congregate space has come available and that you are being placed there. I just wanted to check in and see if you have received any communication regarding that placement this morning?

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**



<Outlook-A blue sig.png>

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this

# EXHIBIT C

communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

**From:** Kyle Voils <kyle@chicagohomeless.org>
**Sent:** Friday, April 17, 2026 5:18 PM
**To:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness

Hi Jessica!

Thanks for talking with me just a bit ago. I am really sorry for the hardships that you have endured trying to get shelter here in Chicago. As we discussed, we are not able to provide legal representation to you currently. However, after our call and just before the close of business I emailed a contact at DFSS requesting assistance with getting you a non-congregate emergency shelter placement. With your permission, I also shared that you need a non-congregate placement because you are a person with disabilities including autism and a survivor of gender-based violence. I also flagged your SR number and phone number for them, and clarified that the pickup address associated with your SR number would need to be updated if you were to be referred and have a pickup. They may contact you directly, but if they contact me with information about a placement, I will contact you promptly in turn.

You and I also discussed that I had been in touch with another agency who had a possible apartment referral through the Chicago Low Income Housing Trust Fund program. You indicated that you did not want me to connect you with that agency for that referral because you have another promising lead for being connected to housing with a subsidy after your emergency situation. You also clarified for me that you are not currently receiving SSI. Just for your reference, I want to let you know that if you were connected to that apartment that I mentioned, to qualify you would have to provide documents including a photo ID, a social security card, birth certificate, proof of income (like paystubs or an SSI

# EXHIBIT C

award letter), and your last 4-6 bank statements. Again, I know that you do not want me to take any action related to that connection, but I just wanted to be sure that I shared with you some of the information that I was able to gather after talking with Lauren, just so you are in the loop about what I learned.

I want to express again that I am very sorry for the negative experiences you've had trying to access shelter here in Chicago. I will be sure to follow up with any additional information that I learn.

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End Homelessness**







&lt;Outlook-A blue sig.png&gt;

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

# EXHIBIT C

**From:** Kyle Voils <kyle@chicagohomeless.org>
**Sent:** Friday, April 17, 2026 4:27 PM
**To:** Jessica Lehman
<jessica.j.lehman@icloud.com>
**Subject:** Re: Connecting you with the Chicago
Coalition to End Homelessness

Hi Jessica!

Yes, I am able to give you a call in just a minute. I
will be calling from 312-973-6106.

Sincerely,

Kyle

**Kyle Voils** | Senior Attorney
he/him/his *(Why do pronouns matter?)*
**Direct:** 312.973.6106 | **Main:** 312.641.4140
**Law Project of the Chicago Coalition to End
Homelessness**

<Outlook-A blue sig.png>

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If you are not the intended recipient of this communication (or an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient), or if you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including any attachments, without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

**From:** Jessica Lehman <jessica.j.lehman@icloud.com>
Sent: Friday, April 17, 2026 4:17 PM

# EXHIBIT C

**To:** Kyle Voils <kyle@chicagohomeless.org>
**Subject:** Re: Connecting you with the Chicago Coalition to End Homelessness

Hi Kyle,

Thank you so much for agreeing to help. I know it's late in the work day, but I'd greatly appreciate if you could try to give me a call or text at (317) 450-9525 before the end of the workday if at all possible!**Lauren said you might have some emergency ideas to help me get through the weekend.**

I'm dealing with a gap in sensory safe shelter for this weekend as a 23-year-old autistic transgender woman. I've attached to this reply all relevant documents, including:
1. My Ready-To-Go Legal Memorandum and Case Analysis
2. My documents including letters from my psychiatrist saying why traditional shelters are unsafe for me especially with sensory.
3. Evidence of my work as a Legal Researcher helping spark the Orr v. Trump case, helping demonstrate why I cannot return safely to Indiana.

Thanks so much,
Jessica Lehman (she/her)


On Apr 17, 2026, at 4:11 PM, Lauren Galloway <LaurenG@equipforequality.org> wrote:


Hi Jessica,

It was nice talking with you today! As we discussed, I wanted to connect you with Kyle Voils with the Chicago Coalition to End Homelessness. Kyle is great and may be able to offer some additional support regarding your immediate need for shelter.

We thought it might be easiest for the two of you to connect directly, and I've CC'ed Kyle here so that the two of you can coordinate follow up.

Wishing you the very best,

Lauren

Lauren Galloway
Staff Attorney
Illinois ADA Project, Manager
Equip for Equality, Inc.
20 N. Michigan Avenue, Suite 300

# EXHIBIT C

Chicago, IL 60602

The information contained in this email message and in any attachments constitutes confidential information that belongs to Equip for Equality, Inc. This email and attachments may also contain attorney work product or information protected by the attorney-client privilege or other privileges. This information is intended only for the use of the individual or entity to which it is directed. If you are not the intended recipient, you are hereby notified that any disclosure or reliance on this information is prohibited. If you have received this message in error, please notify us at 800-537-2632 (voice) or 800-610-2779 (TTY). Thank you.

# Exhibit D

| To | Chicagoland Hospitals |
|---|---|
| From | The Chicago Department of Family and Support Services & the Chicago Department of Public Health |
| Date | September 2025 |

## Guidance related to safely discharging and placing people experiencing homelessness into City of Chicago shelters

This document outlines a process to ensure patients being discharged from hospitals in the region can safely transition into Chicago's shelter system. By standardizing our approach, we aim to improve health outcomes and build shared understanding across all organizations and individuals involved.

Overview of the DFSS shelter system

The Chicago Department of Family and Support Services (DFSS) funds and oversees a network of shelter programs that includes over 6,800 shelter beds at 55 separate facilities operated by 34 different delegate agencies. Shelters accommodate homeless individuals and families and special populations including domestic violence survivors and young people. For people experiencing homelessness who need reasonable accommodation within the City of Chicago's shelter system, there is a policy in place for providers to follow, to ensure their needs can be properly addressed.

DFSS manages six Community Service Centers (CSC) throughout the city. These spaces help individuals and families in need of assistance access a wide range of resources, including City-funded and non-City-funded shelter referrals and placement. Centers operate Monday through Friday during normal business hours. It's important to note that none of the CSCs serve as drop-in centers or overnight shelters.

In December of 2024, DFSS and the Mayor's Office, in collaboration with regional partners and stakeholders, opened the 24/7 Chicago Shelter Placement and Resource Center (SPARC), a central access point to request shelter and receive basic services for adults (18+) without children experiencing homelessness in Chicago.

Discharging patients to City-funded shelters

Due to limited resources, the city shelter system does not have enough available beds to serve every adult experiencing unsheltered homelessness and, as a result, there are often long wait times after a request is made to 311. Further, the City-funded shelters cannot support patients with post-acute care needs, including people who require 24/7 medical care, or cannot remain safe even with a reasonable accommodation in place at a shelter.

Further, the vast majority of City-funded shelters do not provide skilled nursing or medical services. As such, they are only safe and appropriate for individuals who are able to take care of their own Activities of Daily Living (ADLs) with reasonable accommodations. All other individuals are not appropriate for a City-funded shelter, and thus, cannot be discharged to any DFSS CSCs, or the SPARC. Such individuals should be referred to the most appropriate medical or supportive living facility based on their medical needs.

1

# Exhibit D

A list of medical and/or supportive living facility types and contact information is included in Appendix 2 of this document. Hospital staff can assess ADLs using the Table 2 on the next page. A person's ability to complete ADLs is also assessed upon intake into the homeless services system, at which time it is determined if they can be safely placed into a City-funded shelter, or if they need a higher level of support than a traditional shelter can provide. The shelter placement process is described in more detail on the following page. *Table 1, below, describes individuals who can safely live at a City-funded homeless shelter.*

| Table 1<br>Individuals able to be placed in City shelters<br>The individual needs to meet all the conditions listed below to be medically appropriate for City-funded shelters | |
| --- | --- |
| • Stable<br>  o   Not in an emergency medical condition. Meaning that an average person cannot reasonably expect that the individual will be put in serious jeopardy in the absence of medical care (215 ILCS 134/10)<br>  o   Not actively in an acute mental health episode with the potential to harm oneself or others | • Able to perform ADLs (Activities of Daily Living) with or without the support of a reasonable accommodation or modifications<br>  o   Skills that allow an individual to maintain their health, including bathing, dressing, grooming, eating, toileting, and transferring.<br>• Reasonable accommodations or modifications may include but are not limited to individuals using and having access to mobility aids near their bed, use of adaptive devices while eating, widening pathways or clearing clutter, describing the location of a toothbrush on a counter to someone with low vision. Not in need of medical respite care |

Separate from City-funded traditional shelters, the City funds 64 respite beds administered by nonprofit delegate agency, The Boulevard, which serves as a medical-respite facility in Chicago. Many hospitals have direct agreements with The Boulevard or other respite centers. Contact and referral information for the Boulevard can be found in appendix 2 of this document. Hospitals should prioritize making effective their agreements and, should never discharge an unsheltered individual deemed in need of respite care to any CSCs, the Shelter Placement and Resource Center (SPARC), or a City-funded shelter.

2

# Exhibit D

| Table 2 |
| --- |
| **Individuals unable to be placed in City shelters** |
| If the individual has one or more of the health conditions, limitations of independent activities, or functional needs below, they should be referred to a higher level of care than City-funded traditional shelters |

- Inability to care for self and manage ADLs with or without a reasonable accommodation or modification
  - Skills required to independently care for oneself, such as eating, bathing, and mobility.
- Need for home care or visiting nurse services beyond wound care or IM/IV medication administration and beyond 2 weeks
- Severe immunosuppression (chemotherapy, end-stage AIDS, post-transplant, with an Absolute Neutrophil Count (ANC) <500MI)
- Major dementia with cognitive deficits (MMSE <25)
- Peritoneal dialysis
- Inability to make needs known or follow commands
- Unresolved delirium

- Does not possess the competency to independently manage chronic illnesses or medication administration, schedule, and reminders, including inability to self-administer insulin
- Inability to manage urinary or bowel incontinence or explosive diarrhea
  - A person is able to manage their condition if they can use foley catheters, pads, and other incontinence supplies by themselves.
- Oxygen-dependence requiring an oxygen tank/cylinder of any size, containing liquid or compressed oxygen
- Cranial Halo Devices or stabilizing protective gear worn continuously
- Poses imminent risk of physical harm to themselves or others
- On a ventilator

## Process when the individual is able to be placed in City-funded shelter

When the individual is stable, can perform ADLs, and meets all the conditions in Table 1 above, the process to help them obtain a shelter placement is as follows:

1. **Assess if the individual is experiencing unsheltered homelessness.** It is recommended to make best efforts to get in contact with a family member, friend or caregiver first, as soon as the individual enters the hospital or medical center.
   - If the individual is experiencing domestic violence, it is recommended that the individual receive assistance contacting the Illinois Domestic Violence Hotline for shelter, legal advocacy and other services.
   - If the individual is experiencing sexual violence or assault, it is recommended to connect that individual with the Rape Crisis Hotline for the Chicago metropolitan area.
   - If the individual is experiencing human trafficking either labor or sex, it is recommended to connect the individual with the Cook County Human Trafficking Hotline

*Contact information for these organizations is listed below.* Alternatively, these Hotlines may be reached by calling 311.

2. **Calling for shelter placement.** If an individual is seeking shelter placement, the hospital's care team should call 311. The earlier a hospital calls, the better chances to get a shelter bed in alignment with the desired discharge timeline.
   - When calling 311, the individual or hospital will receive a service request number (also known as a SR#) for shelter placement that puts the individual in the queue for shelter availability. The hospital

3

# Exhibit D

should communicate with the 311 operator, upon requesting shelter placement, if the individual has a medical condition and needs that would require specialty care.

- o When a placement is found, The Salvation Army will reach out to the given contact number (individual's number or caseworker's number).
- o When a bed is available, it may take up to 24 hours for transportation to arrive to take the individual to shelter.
  - ➢ Coordinate with The Salvation Army about the date and time of the discharge, transportation, and anything else necessary for a safe discharge. The Salvation Army will ensure the shelter provider receives this information.
    1. It is important that the client waits for The Salvation Army transportation, and that **the hospital does not transport the client independently**.
    2. The Salvation Army transportation staff need to conduct an in-depth assessment and referral process that can only be done in-person during the transport process. This is part of the mandatory Verification of Homelessness process required by the United States Department of Housing and Urban Development (HUD). **If this is not done, the individual cannot be placed into shelter.**
  - ➢ Inform The Salvation Army about the individual's medical needs (cannot be medically urgent).
    1. If the individual requires medication, the hospital staff or the individual should bring this with them.
    2. If the individual was diagnosed with an infectious disease and needs to be isolated on site, the hospital should indicate to The Salvation Army what the isolation recommendations are and the recommended duration of isolation.
  - ➢ The individual must be properly clothed and wearing shoes. Dropping off individuals in hospital gowns or underwear is not fit for shelter of any kind but, in this case, for City-funded facilities that hospitals are working to place individuals into.

3. **If a placement is <u>not</u> immediately identified:**
- o Coordination with The Salvation Army is still important and is the first best option if a proper placement is not identified right away.
- o When a bed is not immediately available, it may take 3-5 days for one to become available.

4. **Other options**
- o DFSS Community Service Centers (CSCs) a centers or overnight shelters. The SPARC is a central place where single adults are able to be assessed for diversion and shelter placement and receive interim basic services, such as food and overflow shelter, while awaiting services. Space is available for up to 200 people maximum waiting for shelter placement.
  - ➢ is equivalent to dropping them off on the street.
- o Prior to discharging unsheltered individuals to the **SPARC**, hospitals are urged to take the following steps:
  - ➢ **Contact the SPARC prior to dropping off any client <u>to ensure that the site is not at capacity.</u> The contact number for the SPARC is 773-526-3707.**
  - ➢ Coordinate with the SPARC staff about the date and time of the discharge, transportation, and anything else necessary for a

4

# Exhibit D

safe discharge. This will help ensure there is capacity at the SPARC at the time of discharge.

➤ Inform the SPARC coordinator about the client's medical needs (cannot be medically urgent). If the individual requires medication, have them bring this with them.

➤ The individual must meet all the conditions in Table 1 and be properly clothed and wearing shoes. Dropping off individuals in hospital gowns or underwear is a risk to their health and safety.

➤ **Coordination with this location is required.** If an individual is dropped off without coordination and SPARC is at capacity, the staff will help them create a shelter request (SR) but they will not be able to wait on-site due to safety measures. This type of action is equivalent to dropping them off on the street.

When the individual is not medically stable, cannot perform ADLs, and/or does not meet all the conditions in Table 1, Chicagoland hospitals, which includes its representatives, workers, or anyone affiliated with them, cannot discharge them at any of DFSS CSCs or the SPARC. While the SPARC can provide brief opportunities for overnight shelter when beds are available and there is no shelter availability, individuals must meet all the conditions in Table 1.

<u>Medically appropriate alternatives for unsheltered individuals who are not appropriate for City-funded shelters</u>

When the individual is unable to be safely placed in a City-funded shelter due to the need for medical care and/or advanced interventions, Chicagoland hospitals may coordinate with the State of Illinois or directly with the living facility available and appropriate for such individuals. The City of Chicago, including DFSS, does not oversee these resources, with the exception of The Boulevard respite center.

5

# Exhibit D

| Placement alternative | Contact | Phone | Other resources |
|---|---|---|---|
| Specialized Mental Health Rehabilitation Facility (SMHRF) | Illinois Department of Healthcare and Family Services (HFS) | 800-226-0768 (Client Health Care Hotline) | Referential list of SMHRFs in Chicagoland |
| Crisis Residential Providers | Illinois Department of Human Services | 1-800-843-6154 | Crisis Residential Providers |
| Respite Center | Illinois Public Health Institute | 312-850-4744 | The Boulevard Pre-Intake Application Form |
| Respite Center | The Boulevard Chicago | 773-533-6013 | The Boulevard Pre-Intake Application Form |
| Respite Center | Illinois Respite Coalition | 866-455-7377 ext. 101 or ext. 103 for Spanish | Cook County Medical Respite Network |
| Nursing Home | Illinois Department on Aging | 800-252-8966 | IDPH website for Facility Lookup and Nursing Home Compare Tool |
| Long Term Care (LTC) Facility | HFS | 217-782-0545 | Chicago LTC Contact List |
| Long Term Care (LTC) Facility | Illinois Department of Human Services | 800-843-6154 (If the individual has a developmental disability or mental illness) | Chicago LTC Contact List |
| Veterans' Homeless Program | Illinois Department of Veteran's Affairs | 815-468-9737 | Prince Home at Manteno Application |
| Veterans' Homeless Program | National Call Center for Homeless Veterans | 877-424-3838 | VA Homeless Program Page |
| Illinois Veterans' Homes | The Adjutant Illinois Veterans' Home - Chicago | 773-794-3763 | Veterans' Home at Chicago page |

Remember that the most appropriate housing resource for a discharged individual **depends on their medical needs**. This mindset is true for all individuals, including people experiencing unsheltered homelessness.

Individuals who are experiencing homelessness as a result of gender-based violence or human trafficking

6

# Exhibit D

If the person being discharged is experiencing homelessness due to domestic violence, sexual violence, or human trafficking, there may be other resources available to them through emergency hotel stays, domestic violence shelters, or the Coordinated Entry System. While capacity is not guaranteed nor always funded by the City, to access these resources, you or the participant must contact any of the hotlines below.

| Illinois Domestic Violence Hotline | Chicago Rape Crisis Hotline | Local Human Trafficking Hotline |
|---|---|---|
| 877-863-6338<br>Call or text 24/7<br><br>Chat online 24/7 at Get Help - The Network (the-network.org)<br><br>English, Spanish and other languages available. | 888-293-2080<br>Call or text 24/7<br><br>Chat online M-F 9am-5pm at Rape Crisis Hotline - YWCA Metropolitan Chicago (ywcachicago.org)<br><br>English, Spanish and other languages available. | 877-606-3158<br>Call 24/7<br><br>English, Spanish and other languages available. |

As a referential (unofficial) resource, please review the following documents:

- Workflow with housing resources available for discharged clients experiencing homelessness in Chicago (**Appendix 1**)

- Referential (unofficial) guidelines when discharging clients unfit for DFSS homeless shelter (**Appendix 2**)

7

# EXHIBIT D

**Appendix 2**

*Referential guidelines. For official information, please refer to the State and Federal regulations.*

1.  <u>Path when discharged individuals have acute mental health concerns:</u>

- There are four resources available, all administered by the State:
  - o Specialized Mental Health Rehabilitation Facility (SMHRF)
  - o Crisis Residential Providers
  - o Respite Centers
  - o Nursing Homes

- SMHRF:
  - o Responsible for the Illinois Department of Healthcare and Family Services (HFS)
  - o SMHRFs are facilities that are federally designated as institutions for mental disease (IMDs) that specialize in providing services to individuals with serious mental illness
  - o People with high mental care needs are eligible for SMHRFs, but not appropriate for individuals in crisis (danger to themselves or others). For those needing a higher level of medical care, skilled nursing homes may be the best option
  - o Most SMHRFs require Medicaid coverage
  - o For more information, visit (includes list of SMHRFs in Chicagoland): https://mentalhealthillinois.com/residential/
  - o For more referential information, visit (IL SMHRF overview presentation 2022): https://maximusclinicalservices.com/sites/default/files/pasrr/documents/IL-SMHRF-Process-and-Intent-Handout-7.8.22.pdf

- Crisis Residential Providers
  - o Administered by the Illinois Department of Human Services (IDHS)
  - o Crisis residential providers offer short-term, supervised, and recovery-oriented care for individuals experiencing a mental health crisis. These providers offer safe, secure environments for stabilization and can act as a bridge to other long-term mental health services. They typically provide crisis intervention, assessment, and treatment in community-based facilities.
  - o Call IDHS at 1-800-843-6154
  - o Refer to the list of Crisis Residential Providers here:
  - o https://www.dhs.state.il.us/page.aspx?item=164781843-6154

- Respite Center:
  - o Part of Illinois Medical Respite Capacity Building Initiative (IMRCBI), which is led by the IL Public Health Institute

10

# EXHIBIT D

- o Respite centers are short-term housing combined with health services that allow individuals experiencing homelessness the opportunity to rest, recover, and heal in a safe environment while accessing medical care and other supportive services. Welcomes behavioral services
- o Do not require Medicaid or other types of insurance
- o The Boulevard is the biggest respite center in Chicago (64 beds)
  - ➤ Call 773-533-6013
  - ➤ Pre-Intake Application Form
- o Living Room Program (LRP) is for individuals in need of a crisis respite program with services and supports designed to proactively divert crises and break the cycle of psychiatric hospitalization https://www.dhs.state.il.us/page.aspx?item=126349

- Nursing Home:
  - o Nursing homes are residential facilities that offer around-the-clock skilled nursing care in addition to other supportive services.
  - o These facilities are licensed, regulated and inspected by the IL Department of Public Health.
  - o With Medicaid, which will pay for a nursing home only when it's medically necessary (previous needs screening)
  - o You may find the list of 157 Nursing Homes DFSS Senior Services Division monitors for the Ombudsman program (updated December 2024) here.

Additionally, when the individual is a veteran, they can access the following resources:

- Veterans Homeless Program (Prince Home)
  - o The Prince Home at Manteno is a program for homeless veterans who are also diagnosed with a clinical disorder and/or physical disability, helping to cope with issues such as Post Traumatic Stress, substance abuse, and other challenges. It is located 40 miles south of Chicago.
  - o The facility has a maximum occupancy of 15 residents.
  - o To submit an application to Prince Home at Manteno:
    - ➤ Prince Home at Manteno Application
    - ➤ Phone: 815-468-9737
- Illinois Veterans' Homes
  - o Illinois veteran and eligible spouses seeking skilled and domiciliary care:
    - ➤ For veterans seeking skilled care, the program offers five veterans' homes located across Illinois: Chicago, Anna, LaSalle, Manteno and Quincy.
    - ➤ For veterans seeking domiciliary care, the program offers grants of up to $15,000 to make their homes suitable for their personal and medical needs.
  - o The Veterans' Home of Chicago is situated on the northwest side and offers over 200 private rooms with baths. This home accommodates veterans seeking skilled nursing and memory care.

11

# EXHIBIT D

- o Veterans who have a monthly income will pay a monthly maintenance charge towards the total cost of their care. The charge is based solely on the monthly income and does not include other assets. Also, there are Aid & Attendance allowance opportunities.
- o For more information:
    - ➤ Visit: https://veterans.illinois.gov/services-benefits/homes/homes.html
    - ➤ Contact the Adjutant Illinois Veterans' Home – Chicago: Phone (773) 794-3763, Address: 4250 N. Oak Park Avenue, Chicago, IL, 60634.

2.  **Path when discharged individuals have acute physical health conditions and cannot perform ADLs:**
    - There are two resources available, both administered by the State:
        - o Long Term Care Facilities
        - o Nursing Home
    - LTC Facilities:
        - o LTC Facilities, individuals must be transferred over from a 3-day hospital stay.
        - o The Department of Health Care and Family Services (HFS) is responsible for the Medicaid LTC program.
        - o Individuals in LTC must also have Medicaid, or someone must be able to help them access it.
    - Nursing Homes:
        - o Nursing homes are regulated by public and private agencies at the state and federal levels, including the Illinois Department of Public Health (IDPH) and the U.S. Department of Health and Human Services' Health Care Financing Administration (HCFA)
        - o Nursing homes are residential facilities that offer around-the-clock skilled nursing care in addition to other supportive services
        - o With Medicaid, which will pay for a nursing home only when it's medically necessary (previous needs screening)
        - o List of Illinois Nursing Homes

Additionally, when the individual is a veteran, they can access the following resources:

- Veterans Homeless Program (Prince Home)
    - o The Prince Home at Manteno is a program for homeless veterans who are also diagnosed with a clinical disorder and/or physical disability, helping to cope with issues such as Post Traumatic Stress, substance abuse, and other challenges. It is located 40 miles south of Chicago.
    - o The facility has a maximum occupancy of 15 residents.
    - o To submit an application to Prince Home at Manteno:
        - ➤ Prince Home at Manteno Application
        - ➤ Phone: 815-468-9737
- Illinois Veterans' Homes
    - o Illinois veteran and eligible spouses seeking skilled and domiciliary care:

12

# EXHIBIT D

- ➢ For veterans seeking skilled care, the program offers five veterans' homes located across Illinois: Chicago, Anna, LaSalle, Manteno and Quincy.
- ➢ For veterans seeking domiciliary care, the program offers grants of up to $15,000 to make their homes suitable for their personal and medical needs.
  - o The Veterans' Home of Chicago is situated on the northwest side and offers over 200 private rooms with baths. This home accommodates veterans seeking skilled nursing and memory care.
  - o The admission to an Illinois Veterans' Home is based upon:
    - ➢ The ability of the Veterans' Home to provide adequate and appropriate care and services required by the person.
    - ➢ Bed availability
  - o Veterans who have a monthly income will pay a monthly maintenance charge towards the total cost of their care. The charge is based solely on the monthly income and does not include other assets. Also, there are Aid & Attendance allowance opportunities.
  - o For more information:
    - ➢ Visit: https://veterans.illinois.gov/services-benefits/homes/homes.html
    - ➢ Contact the Adjutant Illinois Veterans' Home – Chicago: Phone (773) 794-3763, Address: 4250 N. Oak Park Avenue, Chicago, IL, 60634.

3. Path when discharged individuals can perform ADLs but need medical respite care:

- Respite Center
  - o Part of Illinois Medical Respite Capacity Building Initiative (IMRCBI), which is led by the IL Public Health Institute
  - o Respite centers are short-term housing combined with health services that allows individuals experiencing homelessness the opportunity to rest, recover, and heal in a safe environment while accessing medical care and other supportive services. Welcomes behavioral services
  - o Do not require Medicaid or other types of insurance
  - o The Boulevard is the biggest respite center in Chicago (64 beds)
    - ➢ Call 773-533-6013
    - ➢ Pre-Intake Application Form

4. Path when discharged individuals are seniors or people with disabilities with Medicare

- Whenever a senior or person with disabilities who qualifies for Medicare is hospitalized, the individual shall be notified of discharge at least 24 hours prior to discharge from the hospital
- Also, hospital must notify Nursing Home at least 24 hours prior to discharge
  - o If the assessment is completed, process ends there

13

# EXHIBIT D

- o If the assessment cannot be completed, hospital notifies Department on Aging which shall notify the Department of Healthcare and Family Services
- o The Illinois Department on Aging shall adopt rules to address these instances to ensure that the individual is able to access nursing home care
- o The Illinois Department on Aging, in coordination with hospital, can also determine the transfer **of the individual to an LTC**
- State of Illinois Centers for Independent Living
  - o You can find a directory of CILs at ILRU.org
- For general information about resources for seniors, contact the appropriate Area Agency on Aging (AAA)
  - o You can find a directory of AAAs at https://ilaging.illinois.gov/forprofessionals/aaa-list.html

14

# EXHIBIT E

## EXHIBIT E – UNSWORN DECLARATION OF JESSICA JAMIE LEHMAN UNDER PENALTY OF PERJURY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

Jessica Lehman,

Plaintiff,

v.

City of Chicago,

Defendant.

Case No. _____

Judge _____

---

**DECLARATION OF JESSICA JAMIE LEHMAN**

# EXHIBIT E

I, Jessica Jamie Lehman, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am the Plaintiff acting Pro Se in this action. I am 24 years old and currently reside in a confidential hotel-based shelter program operated by SGA Youth & Family Services ("SGA"), a delegate agency of the City of Chicago's Department of Family and Support Services ("DFSS").

2. On **May 28, 2026**, I informed an SGA employee that I intended to request disability accommodations. During a phone call on **May 29, 2026**, I stated: "I told you last night I was going to request an accommodation," and the SGA employee responded, "Yep," confirming SGA's knowledge of my protected activity.

3. Later on **May 29, 2026**, while I was experiencing a panic attack, SGA case manager **Sianny Munroe** sent me a text message stating that I was being **terminated effective June 2, 2026** for an alleged "major breach of confidentiality," specifically claiming that I disclosed the hotel address to Christopher from Thresholds, a case manager for my Department of Mental Health (DMH) provider.

4. After receiving the termination notice, I immediately contacted Thresholds to understand what had occurred. While still in the car with my Thresholds case manager, Christopher, he confirmed to me verbally that Thresholds already had the hotel address from their intake paperwork. Later that same day, Thresholds staff called SGA directly and confirmed that any address information came from Thresholds' own internal records, not from me.

# EXHIBIT E

During that call, the Thresholds staff member told SGA staff the following::

a. **Thresholds already possessed the hotel address through their internal systems** before any discussion with me that day.

b. When I was ready to give the address to my Thresholds case manager, **he stopped me and said he already had it.**

c. Thresholds staff—not me—had communicated the address to SGA in the course of their normal duties.

5. Thresholds staff **called SGA on May 29, 2026,** before I contacted them, to confirm directly that **I had not disclosed the address** and that any disclosure came from Thresholds' own prior internal records.

6. I did provide the hotel address to Thresholds during their initial intake process because it was required for me to receive services. However, I did not disclose the address in violation of any program rule, nor did I disclose it in connection with the May 29 incident. Thresholds staff confirmed to me—and later directly to SGA—that they already had the address from their own intake records and that any address information SGA received came from Thresholds' internal system, not from any improper disclosure by me.

7. I met with Thresholds near the hotel because I have a **documented disability accommodation** requiring that in-person meetings occur only in quiet, private, sensory-safe environments. SGA and DFSS have been aware of this since at least **May 12, 2026,** when I provided Dr. Mathewson's letters.

# EXHIBIT E

8. SGA has **not withdrawn** the termination notice, even after Thresholds confirmed that I did not disclose the address.

9. SGA never provided me with any alternative mailing address for my housing applications, including the Front Door Diversion Program packet and the Bridge Subsidy referral. Providing an address to my DMH provider was necessary for these applications.

10. The termination notice was issued **one day after** I informed SGA of my intent to request accommodations, and during a psychiatric panic episode, without any individualized assessment or ADA-compliant communication. SGA refused to discuss the matter by phone, insisted on an immediate in-person confrontation, and labeled the situation a "serious breach" before gathering any facts.

11. Based on the timing, the false factual basis, and SGA's refusal to engage in any interactive process, I believe the termination is **retaliatory** and based on my disability and my protected activity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 30, 2026

/s/ Jessica Jamie Lehman

Chicago, IL 60612

Email: jessica@jessicaj.studio

Phone: (317) 450-9525

# EXHIBIT F

**Exhibit F – Audio Recording of May 29, 2026 Phone Call with SGA Program Therapist Georganne Struss (Post-Termination Call; Authenticated by Plaintiff)**

An audio recording of Plaintiff's May 29, 2026 phone call with SGA program therapist Georganne Struss, made after SGA case manager Sianny Munroe had already sent Plaintiff the written termination notice via text message. The recording captures SGA acknowledging that Plaintiff informed them on May 28 that she intended to request disability accommodations, refusing to discuss the matter by phone despite Plaintiff stating she was in a panic attack, insisting on an immediate in-person confrontation, and characterizing the situation as a "serious breach" before gathering any facts. The recording further reflects SGA's refusal to engage in the ADA interactive process and its escalation of Plaintiff's psychiatric distress. The audio file is hosted at a timestamped public Google Drive link below and is authenticated by Plaintiff's accompanying declaration:

https://drive.google.com/file/d/1NwviosFqu6Pn_6AwYfZQDg6yBmz8_FVF/view?usp=share_link

# EXHIBIT G





**Sianny**

**Thursday 12:21 PM**

Hi Sianny, this is Jessica Lehman. I just emailed you and Sianny the official MAXIMUS documentation confirming that FDDP is the correct Bridge Subsidy pathway for clients with SMI diagnoses like mine. It applies to both my case and will hopefully help others in the program with similar needs. The email also includes my weekly updates. 🤍

**Friday 2:36 PM**

I was told you have a guest and someone came to the confidential location looking for you.

This is a breach of confidentiality and I am unsure if it was Thresholds why they would come to a confidential location where they were not allowed to come to meet you. This is a breach of contract, allowing a guest to know your location, but also is looking for you by name

Due to the location being exposed, we have to move forward with removing you from the program by Tuesday.

**Friday 7:20 PM**

I acknowledge that I have received notice of your intent to remove me from the program effective Tuesday, June 2nd, 2026.

+    Text Message · SMS   😊

---

✕     Edit

**Sianny**

📞   📹   ✉️   ▦

**Info**   Photos

phone
**+1 (312) 788-7094**   📞

Hide Alerts   ⬭

Show in Shared with You   ⬭

Automatically Translate   Off ⌄

Show in Contacts

Block Contact

Download 1 Attachment in iCloud

This conversation is not encrypted. Learn more...

# EXHIBIT G



**Sianny**

Sat, May 9 at 6:57 PM

Hi Sianny! Before our Tuesday meeting, could you look into any long-term housing subsidies that would be appropriate for my disability needs as backups to the Illinois Bridge Subsidy? I'm continuing to work towards hopefully getting a referral for it through Thresholds.

I'm specifically looking for programs that:
- Don't require a minimum rent payment when someone has zero income (income-based only).
- Don't have time limits or "self-sufficiency" deadlines that will lead me back to homelessness in a few years when the voucher runs out - renewable is fine.
- Don't require work participation or case-management compliance beyond what's reasonable for someone with disabilities.
- Offer self-contained units (private bathroom, bedroom, and no shared living areas due to sensory needs).

If you know of any programs that meet these criteria, could you bring them on Tuesday so we can review them together? Thank you!

Mon, May 11 at 8:57 AM

Good morning, sounds good I'll do my best to try making connections for referrals and will keep you updated on our resources

Also want to mention our hours! Both Monday-Friday
Sianny 9-5
Georgie 12-8
Any emergency please call 911

Thank you for keeping me in the back of your mind in case anything pops up and letting me know the best hours for me to send texts, I apologize if my prior messages disturbed you during your time off instead of just waiting in your queue.

Thresholds for the Bridge Subsidy got back to me immediately on Friday after I alerted them I had gotten Medicaid, said while they can't assign me to their housing support right away, they were assigning me to a team so I can begin going through that pipeline. I

Text Message · SMS

# EXHIBIT G



**Sianny**
Sat, May 23 at 1:39 PM

So a bit of a security problem last night (05/22) around 10:20PM: Some stranger (I believe they said was a man) was allegedly there as a "guest" for me, cited my room number, and the hotel staff called up to my room phone telling me I had a visitor. I told them I hadn't invited anyone and to send them away (I have not given out my address to anyone), they did. I told Abraham and he's taking a look into what happened.

I'm safe, that's what matters. Could have just been a drunk person off the street who had the wrong hotel, we don't know. They left after being turned away and have not since returned. I'll see what Abraham finds if anything.

Tuesday 9:03 AM

Good morning, I'm sorry this happened and I hope this didn't alarm you
I spoke with management about this Saturday as well and I'm sorry they disturbed you

Tuesday 10:42 AM

They informed me that it was a false alarm, thank you for reaching out 🤍

Wednesday 3:52 PM

Please join us at Ricanos restaurant for a group lunch before some of our clients transition!

**FAREWELL LUNCH**
PLEASE JOIN US
TO SAY FAREWELL TO SOME CLIENTS
EXITING THE PROGRAM.
WED. JUNE 3rd - 12:00 PM

Sianny

Info    Photos

phone
+1 (312) 788-7094

Hide Alerts

Show in Shared with You

Automatically Translate    Off

Show in Contacts

Block Contact

Download 1 Attachment in iCloud

This conversation is not encrypted. Learn more...

# EXHIBIT G

**From:** **Jessica Lehman** jessica.j.lehman@icloud.com ✐
**Subject:** Re: SGA I Client Resources
**Date:** May 12, 2026 at 4:22 PM
**To:** Munroe, Sianny smunroe@sga-youth.org
**Cc:** Struss, Georganne gstruss@sga-youth.org
**Bcc:** Jessica Lehman jamie.strawberry321@gmail.com



Hi Sianny,

Thank you for getting back to me. I've gone through each of the resources you shared. Many are the same ones I exhausted before arriving in Chicago, while others have since been confirmed as inapplicable by providers. I wanted to summarize what I found so we can stay aligned on realistic backup and alternatives to keep in mind while I attempt to pursue the Illinois PSH Bridge Subsidy (**the SMI + Homelessness path**) through Thresholds. ·

## 1. Illinois Housing Development Authority (IHDA)

IHDA does not directly offer rental assistance to individuals with disabilities. Their tenant-facing page (Rental Housing Resources) mainly links to:

- **ILHousingSearch.org**, which is a general landlord listing site. Some landlords may accept vouchers, but it is not a voucher program, not PSH, and not a reliable indicator of real-time availability. The Chicago Housing Locator has the same limitations.

- The remaining links on that page appear to be property listings that are not voucher providers.

## 2. Mayor's Office for People with Disabilities (MOPD) Housing Resources Guide

I reviewed the guide and found:

- The **Chicago Housing Locator** (already addressed above).

- Two potentially relevant agencies:
    - **Housing Authority of Cook County**, which only has Sunrise Apartments in Chicago, and they currently have no available units.
    - **Single Room Housing Assistance Corporation**, which is no longer in operation.

## 3. Thresholds Housing and Catholic Charities

I've confirmed with Cortney Ritsema at Thresholds that most PSH programs and related housing options are backed up several years. Their websites also show closed waitlists, and many programs do not meet my disability-related needs.

## 4. Mercy Housing

I did find several Mercy Housing properties with open waitlists that are not seniors-only. I'm unsure how long the waitlists are, but these may be worth reviewing together:

- Roseland Village
- The Studios
- South Loop Apartments
- Miriam Apartments
- Malden Arms II Apartments
- Delmar Apartments

## 5. Illinois Department of Human Services (IDHS)

Through DMH, IDHS administers the **PSH Bridge Subsidy**, which I am pursuing through Thresholds (since referrals must come from a DMH provider). Additional programs mentioned include:

- **Section 811 PRA**, which I am not eligible for because I am not a class member of the qualifying cases.
- The **Statewide Referral Network (SRN)**, which I cannot self-refer to.

## 6. Chicago Housing Authority (CHA)

The main Section 8/HCV waitlist has been closed for over a decade. Other CHA building-specific waitlists are open, but most have multi-year waits and do not meet my disability-related needs (no clinical support, no sensory-safe units, and no immediate availability).

## 7. National Disability Institute

This appears to restate information already covered in IHDA, MOPD, and IDHS materials, without offering additional housing pathways.

## 8. Chicago Coalition for the Homeless

# EXHIBIT G

CCH is a legal advocacy organization, not a housing provider. Their Senior Attorney, Kyle Voils, previously contacted DFSS on my behalf regarding my needs and the city's obligations, which ultimately led to my referral to your team through DFSS and A Safe Haven Foundation.

**Summary of Viable Options**

Outside of the **PSH Bridge Subsidy** (which other state PSH programs also reference as the required path for eligible individuals), very few options meet my disability-related criteria:

- No minimum rent payment when income is zero (income-based only).
- No time limits or "self-sufficiency" deadlines that would lead back to homelessness.
- No work-participation requirements beyond what is reasonable for someone with disabilities.
- Self-contained units (private bathroom, bedroom, and no shared living areas due to sensory needs).

I have already secured a willing landlord at **Dearborn Plaza** on the Gold Coast who will accept the Bridge Subsidy once I obtain it, and I have toured the building. I will keep you updated as Thresholds continues moving me through their process.

If you come across any additional resources that may align with these needs, I'm happy to explore them with you. **I've also attached my psychiatrist's letters documenting my broader limitations if that is helpful in any way** (packet attached was originally written to UChicago ER but contains the same context and her letters), along with a **resource guide to the PSH Bridge Subsidy** that I found online that I would appreciate if you read before our Thursday 1:1 meeting.

Thank you again for keeping your ears open for additional potential opportunities for me,

Jessica J. Lehman (she/her)

(317) 450-9525

resourceguide_110708.pdf

**Reasonable Accommodation Packet.pdf**

On May 12, 2026, at 2:21 PM, Munroe, Sianny <smunroe@sga-youth.org> wrote:



### Sianny Munroe

- 312-788-7094
- SMunroe@sga-youth.org
- 3501 West 48th Place Chicago, IL 60632
- smunroe@sga-youth.org

---

**From:** Munroe, Sianny <smunroe@sga-youth.org>
**Sent:** Tuesday, May 12, 2026 1:54 PM
**To:** Jessica.jlehman@icloud.com <Jessica.jlehman@icloud.com>
**Cc:** Struss, Georganne <gstruss@sga-youth.org>

# EXHIBIT G

**Subject:** SGA I Client Resources

Hello,

I am attaching some local resources to see if you have checked in with any of these listed below besides Thresholds:

Key Resources for No/Extremely Low-Income Disabled Residents:

- **Illinois Housing Development Authority (IHDA):** Offers rental assistance for people with disabilities through properties that provide supportive services.

- **Mayor's Office for People with Disabilities (MOPD):** Maintains a Chicago Housing Locator for accessible, affordable housing. https://311.chicago.gov/s/article/Mayor-s-Office-for-People-with-Disabilities-Housing-Resources-Housing-Information-Services-Guide?language=en_US

- **Thresholds Housing:** Offers specialized programs, including options for those with no income, targeting, for example, individuals with mental health conditions.

- Catholic Charities: https://www.catholiccharities.net/affordable-housing/affordable-housing-for-people-with-disabilities/

## Key Action Steps:

- Contact the Mayor's Office for People with Disabilities for a complete, up-to-date guide on available accessible housing.

- Consider reaching out to non-profit organizations likeMercy Housing Lakefront for service-enriched, affordable, and accessible housing.

## Additional Resources:
- **https://www.dhs.state.il.us/?item=159358**
- **https://www.dhs.state.il.us/page.aspx?item=87600**
- **https://www.thecha.org/public-housing/additional-assistance-people-disabilities**
- **https://www.nationaldisabilityinstitute.org/illinois/housing-opportunities-for-people-with-disabilities/**
- **https://chicagohomeless.org/our-work/public-benefits/**

Best,



Sianny Munroe

# EXHIBIT G



📞 312-788-7094

✉ SMunroe@sga-youth.org

📍 3501 West 48ᵗʰ Place Chicago, IL 60632

🌐 smunroe@sga-youth.org

Notice: This email contains confidential information, intended only for the individuals(s) named above. If you are NOT the intended recipient, any disclosure, forwarding, distribution, or copying of this e-mail is illegal. If you have received this communication in error, please notify us immediately by return e-mail, and delete the original message from your e-mail system. Thank you.

June 1st 2026　　　　　EXHIBIT H



Dear Jessica,

This letter serves as a formal, one-time written warning regarding a serious violation of program safety protocols and visitor policies. On May 29th, it was brought to the attention of program staff that you disclosed the direct, confidential address of the shelter to an outside party without informing or coordinating with our staff. It is now understood that the individual who arrived at the facility was supported by an external program.

While we recognize that this individual is a professional who forms part of your support network, **the direct address was still shared without prior discussion with our team**. Furthermore, because this visit was unannounced and unexpected by SGA Youth & Family staff and hotel staff, creating a security mix-up regarding our strict **No Visitor Policy**. Our concerns were compounded when you chose to leave the facility premises with this external visitor without notifying or checking out with program staff, leaving your whereabouts unknown to us.

- **Confidentiality of Location:** The physical address of this shelter is strictly confidential. Under no circumstances are clients permitted to share, post, or disclose the location to anyone—including case managers, providers, or professionals from external organizations—**without explicit, prior authorization from our program.**
- **Inter-Agency Coordination:** Professionals must follow established professional protocols to connect with you, rather than arriving at a confidential site without proper identification to the Gender Based Violence shelter.
- **No Visitor Policy & Staff Accountability:** To maintain a secure and accountable environment, unannounced visitors are strictly prohibited. Additionally, for safety and emergency tracking, clients must notify staff before leaving the premises, especially when departing with an outside party.

To maintain your standing and continue receiving services within this program, you must immediately adhere to the following directives:

1. **Cease Independent Location Sharing:** You must immediately stop sharing the facility's direct address. If an external provider or agency requests your address, you must direct them to contact our program staff directly.

June 1st 2026

# EXHIBIT H



2. **Coordinate External Support:** Work with your primary Case Manager here to properly document and coordinate any external professional visits or services so they can be conducted safely and through approved channels.

3. **Mandatory Check-In/Check-Out:** You must communicate with program staff regarding your comings and goings, and you may not leave the premises with outside parties without notifying staff beforehand.

Program Timeline & Exit Notice

Please be reminded that your program participation has an established timeline. Your scheduled exit date from the shelter is **June 26th at 12:00 PM (noon)**, which marks the conclusion of your **60-day stay**.

It is critical that you strictly adhere to all program rules, safety guidelines, and corrective actions listed above for the remainder of your time with us.

Please understand that this is a **one-time warning**. The confidentiality and security of this shelter are paramount. Any future unauthorized disclosure of the location, failure to communicate your whereabouts, or further violations of the visitor policy will compromise the safety of the facility and will result in an immediate review of your program participation, up to and including immediate termination of your housing services prior to your scheduled exit date. We value having you in our program and want to support you in successfully reaching your goals and transitioning safely by **June 26th**. If you have any questions regarding this warning, or if you need assistance coordinating with your external support team or finalizing your exit plan, please reach out to your Case Manager immediately.

Sincerely,

**Sianny Munroe | Case Manager**

SGA Youth & Family Services | GBV Shelter

June 5th 2026

# EXHIBIT H



**YOUTH & FAMILY SERVICES**

The purpose of this Letter of Expectation is to clearly outline the program guidelines that support your safety, accountability, and successful participation in our services. Our goal is to provide you with a structured environment while helping you connect with the outside resources you need. To ensure your safety and maintain accurate program records, you must communicate your whereabouts daily. Please review the following expectations carefully.

- **Departure:** You are required to check in directly with your Case Manager or Counselor before leaving the hotel property.
- **Return:** You must check in directly with your Case Manager or Counselor immediately upon returning to the hotel property.
- **No Visitors Allowed:** To maintain the safety, privacy, and security of all program participants, absolutely no outside visitors are permitted on the hotel premises or inside your room at any time.

We understand that connecting with outside resources (e.g., legal aid, medical professionals, family support, or community organizations) is crucial for your progress. Because visitors are not allowed at the hotel, you must use the following plan to meet with outside entities in a safe, confidential location:

- **Step 1: Identify a Confidential Location**

Meetings must take place at an approved, neutral, and confidential off-site location. Recommended options include:

- o The office/facility of the resource you are meeting.
- o Private meeting rooms at the local public library.
- o Approved community service centers.
- **Step 2: Pre-Schedule and Notify Staff**

Before finalizing any off-site appointments, discuss the details with your Case Manager/ Counselor.

- **Step 3: Complete the Off-Site Plan Log**

For every outside meeting, please complete the brief log below prior to your departure.

# EXHIBIT H



**From:** Munroe, Sianny smunroe@sga-youth.org 📎
**Subject:** Re: Weekly Appointments In/Out Sheet
**Date:** June 15, 2026 at 11:04 AM
**To:** Jessica Lehman jessica.j.lehman@icloud.com, Struss, Georganne gstruss@sga-youth.org

Moving forward, please print out as directed to physically write in and out. This must also include stepping out to the restaurant or any time you have stepped out of the hotel.

Best,



# Sianny Munroe

📞 312-788-7094
✉ SMunroe@sga-youth.org
📍 3501 West 48ᵗʰ Place Chicago, IL 60632
🌐 smunroe@sga-youth.org

---

**From:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Sent:** Friday, June 12, 2026 2:59 PM
**To:** Munroe, Sianny <smunroe@sga-youth.org>; Struss, Georganne <gstruss@sga-youth.org>
**Subject:** Weekly Appointments In/Out Sheet

WARNING: Do not click links or open attachments unless you recognize the source of the email and know the contents are safe.

Attached to this email, completed digitally to preserve writing strength and quality (including legibility) due to hyper-mobility in thumbs.

Thanks so much,
Jessica Jamie Lehman
(317) 450-9525

Notice: This email contains confidential information, intended only for the individuals(s) named above. If you are NOT the intended recipient, any disclosure, forwarding, distribution, or copying of this e-mail is illegal. If you have received this communication in error, please notify us immediately by return e-mail, and delete the original message from your e-mail system. Thank you.

# EXHIBIT H

**From:** Munroe, Sianny smunroe@sga-youth.org
**Subject:** Re: SGA - Warning Letter
**Date:** June 2, 2026 at 11:35 AM
**To:** Jessica Lehman jessica.j.lehman@icloud.com
**Cc:** Struss, Georganne gstruss@sga-youth.org, Arenas, Francisco farenas@sga-youth.org, Olivan, Jonathan jolivan@sga-youth.org

Hello Jessica,

I have connected our Program Director and Program Manager in this thread.

Best,



**Sianny Munroe**

📞 312-788-7094
✉ SMunroe@sga-youth.org
📍 3501 West 48th Place Chicago, IL 60632
🌐 smunroe@sga-youth.org

---

**From:** Jessica Lehman <jessica.j.lehman@icloud.com>
**Sent:** Monday, June 1, 2026 3:41 PM
**To:** Munroe, Sianny <smunroe@sga-youth.org>
**Cc:** Struss, Georganne <gstruss@sga-youth.org>
**Subject:** Re: SGA - Warning Letter

> WARNING: Do not click links or open attachments unless you recognize the source of the email and know the contents are safe.

Hi Sianny,
Thank you for sending this written notice dated June 1st, 2026. I am writing to acknowledge receipt and to clarify several points so that expectations, communication, and disability-related needs are fully understood going forward.

## 1. Disability-Related Communication Needs & Program Rules

Because of my documented sensory and cognitive disabilities, I need program rules, expectations, and procedures to be provided in **clear written form**, including:

- all program rules and policies
- any agreements I have signed
- expectations regarding check-in/check-out
- expectations regarding communication with staff
- expectations regarding external providers
- expectations regarding staff entering or approaching my room
- expectations regarding mail, deliveries, and address use

Please provide copies of all written program rules, policies, and agreements so I can review them carefully and ensure full compliance.

## 2. Clarification of External Providers

Thresholds is my DMH-funded provider under the Front Door Diversion Program (FDDP) that will be my path to the PSH Bridge Subsidy for permanent housing as a person with disabilities. My understanding as of Friday:

- Thresholds staff are permitted to meet with me
- Thresholds is part of my official support team
- Thresholds is coordinating with you regarding my housing plan

To avoid any future confusion, I am requesting that SGA and Thresholds coordinate directly regarding any visits or meetings, consistent with

# EXHIBIT H

your letter's directive about inter-agency coordination. I have already
given Thresholds written permission for you to access my relevant records and communicate with them regarding my ongoing progress towards stability, let me know if you would like me to sign a release for SGA Youth & Family Services.

### 3. Interim Accommodation Request (Quiet Meeting Space)

Because of my sensory disability, I cannot safely meet with providers in loud or chaotic environments. As an
**interim accommodation, I am requesting:**
**A quiet, sensory-appropriate space where I can meet with Thresholds staff when needed.**
This is necessary for me to participate in services safely and effectively with the usual Rapid Rehousing being functionally inaccessible to me.

### 4. Clarification of Address Use & Deliveries

To avoid misunderstandings:

- I do not share the hotel's direct address with anyone except medical providers, disability-related service providers, or agencies that require it for safety or documentation.
- I need clarification on how to receive mail, packages, or documents from DFSS, Thresholds, or other providers.
- Please confirm the correct mailing address and procedure for receiving items and to give to future service providers.

### 5. Check-In / Check-Out Expectations

I will do my best to honor this requirement I am now learning of alerting staff when leaving or returning to the hotel property via SMS message to you. If Georgie would like to be included on these notifications
too, please let me know. I will message you both once I have returned from the Emergency Room.

### 6. Upcoming ADA/IHRA Accommodation Request to DFSS

Before the end of the 60-day period, I will be submitting a
**formal ADA/IHRA reasonable accommodation request** to DFSS regarding my disability-related need for a continuing non-congregate, sensory-appropriate placement while I complete the paperwork to join the Front Door Diversion Program (estimated
2–3 months). I will copy both you and the Law Department of Chicago on that request as a courtesy as it will be a crucial part of my transition plan.
This request will be separate from SGA's internal rules and will be directed to DFSS as the responsible public entity for coordinating ADA Title II requests.

### 8. My Intent Moving Forward

I want to continue working cooperatively with SGA staff and follow all program expectations. Clear written rules and disability-related accommodations will help ensure that I can do so safely and consistently.
Thank you for your time and for helping clarify these items.
Sincerely, Jessica Jamie Lehman
(317) 450-9525
jessica@jessicaj.studio

On Jun 1, 2026, at 2:55 PM, Munroe, Sianny <smunroe@sga-youth.org> wrote:

Hello Jessica,

Here is a copy of the one-time warning letter. As we were unclear on Friday on the unannounced visitor that asked for you by name, we are lifting the exit by tomorrow and encourage you to sign a release of information for Thresholds and SGA to connect. This caused a lot of back and forth concerning your safety and whereabouts and want to move forward with an understanding on how to move forward with services.

Best,

<Outlook-l1dv4jcs.png>

Notice: This email contains confidential information, intended only for the individuals(s) named above. If you are NOT the intended recipient, any disclosure, forwarding, distribution, or copying of this e-mail is illegal. If you have received this communication in error, please notify us immediately by return e-mail, and delete the original message from your e-mail system. Thank you.
<JL Warning Letter 6-1-26.pdf>

# EXHIBIT I

**Subject: Follow-Up After Emergency Temporary Restraining Order Service to Law Department — Formal ADA/IHRA Accommodation Request**

Dear Department of Family & Support Services (DFSS),

This request is a direct follow up to the Emergency Temporary Restraining Order motion I served on the City's Law Department on May 31st, 2026. That motion detailed systemic ADA violations by DFSS and its delegate agency SGA Youth & Family Services, including retaliation, failure to accommodate, and the absence of any functional interactive process.

After service of the TRO motion, the City's Law Department intervened. SGA withdrew its retaliatory termination of my hotel-based placement. Due to the chance of circumstance, I alerted Corporate Counsel that I did not intend to proceed with the emergency motion at that time and would follow up after I recovered from my illness on next steps, while fully reserving my rights to do so later if circumstances change.

Now, I am formally **requesting a reasonable accommodation under Title II of the ADA, Section 504 of the Rehabilitation Act, and the Illinois Human Rights Act (IHRA)**. This request is based on my disabilities: Autism Spectrum Disorder, Post-Traumatic Stress Disorder, Major Depressive Disorder, and Borderline Personality Disorder. As a transgender woman with a trauma disorder, this requires special consideration related to not being forced to share a room or sanitary facilities (such as showers) with cisgender peers for safety.

This matter is not routine. It arises directly from documented systemic failures that have already resulted in an attempted *Olmstead* violation, multiple psychiatric crises, and the involvement of the City's Law Department. I therefore expect this request to be handled by DFSS staff with the authority to implement the accommodations described below, consistent with the City's obligations under federal disability law.

---

# I. Current Status & Purpose of This Request

On April 28th, 2026, after weeks of failed placement attempts, the City (through SGA) placed me in a confidential hotel-based shelter program for survivors of gender-based violence. This placement has provided the private, non-congregate, sensory-controlled environment that my treating psychiatrist, Dr. Paula Mathewson, has documented as medically necessary to prevent psychiatric destabilization (see attached letters).

That program has a 60-day limit expiring June 26, 2026. I am asking DFSS to provide a continued hotel-based, non-congregate placement that meets my disability-related needs while I

# EXHIBIT I

complete the Front Door Diversion Program (FDDP) through Thresholds and transition to permanent housing via the Bridge Subsidy.

I am open to transferring to a different hotel before June 26 if DFSS identifies an appropriate alternative. My need is for the *environment* (private room, private bathroom, quiet, predictable), not a particular provider. I am also willing to receive case management remotely, which gives DFSS flexibility.

---

## II. Medical Necessity: Why a Hotel-Based, Non-Congregate Placement Is Required

Dr. Mathewson's letters (attached) state that congregate shelter settings are medically unsafe for me and would predictably result in psychiatric destabilization, including acute anxiety, dissociation, meltdowns, and suicidal ideation. She explicitly prescribes:

- A private, non-congregate, sensory-controlled sleeping environment
- 24/7 access to my sleeping space (no lockout hours)
- Use of noise-canceling headphones and phone for sensory regulation
- Predictable transitions and advance notice of changes
- Case management conducted only in quiet, sensory-safe spaces or remotely

A hotel room with a private bathroom and 24/7 access is the only type of placement that has consistently provided these conditions. Shared rooms, shared bathrooms, or any semi-congregate setting are medically contraindicated.

---

## III. Systemic Failures: Why the City's Standard Shelter Process Cannot Meet My Needs

The City's 311-based shelter intake system is structurally inaccessible to individuals with sensory and trauma-based disabilities. I have personally experienced the following systemic gaps across three separate placement attempts:

| Systemic Gap | How It Harmed Me |
| --- | --- |

# EXHIBIT I

| | |
|---|---|
| No way to request a reasonable accommodation | I could not submit my psychiatrist's letters or request a private room. |
| No advance notice of placement type | DFSS attempted to send me to a "non-congregate" shelter that was promised to my attorney that was actually a shared room with a shared bathroom. |
| No warning when transportation arrives | Vehicles arrived and left without notification, leaving me stranded overnight in an ER lobby. No ability to prepare for the transition of environments nor to even know they were there. |
| No written confirmation of placement details | I could not assess whether a placement was medically safe before being expected to board a vehicle. Repeatedly sent to sensory unsafe waiting rooms without warning. |
| No appeal, reconsideration, or interactive process | When a placement failed, the only instruction was to restart the 311 queue for the fourth time – which I did not do as it risked erasing all my disability information again. |
| No alternative intake pathway (online, text, in-person) | My sensory and cognitive disabilities require predictable, low-stimulus communication and the ability to review information in writing before making decisions about placement. The 311 system provides no written information about the placement |

# EXHIBIT I

environment, no way to review or confirm details, and no mechanism to submit documentation or request accommodations. Without an alternative intake pathway that allows written communication, I cannot meaningfully assess whether a placement is medically safe or participate in the Interactive Process.

Because of these systemic failures, the Interactive Process has never meaningfully occurred. Each attempt ended in a psychiatric crisis, ER visits, or self-funded hotel stays to avoid harm. The City's internal "flags" for disability are not an ADA process – there is no approval or denial of an accommodation request, no way to submit documentation, no appeal, and no interactive process at any stage.

I am not challenging the existence of a queue; I am stating that I am unable, because of my disabilities, to stand in it. A process that repeatedly erases disability-related accommodation requests is not a remedy – **it is a denial of access.**

## IV. Past Placement Attempts & The Risk of Unnecessary Institutionalization

Between April 8 and April 28, 2026, the City attempted three separate 311-driven placements. Each resulted in:

- Being routed to congregate waiting rooms (SPARC) that triggered nonverbal episodes and a trauma response (April 9)
- Placement in a shared-room congregate shelter (A Safe Haven) where I was denied safe showering, misgendered, and locked out during the day – leading to a 988 call for suicidal ideation (April 11)
- Being offered a "non-congregate" placement that was actually a shared room with shared bathroom (Primo Center)
- Erasure of all my disability information from the 311 system when my service request was reactivated

On April 9, 2026, the City's lack of accessible shelter inventory led UChicago Medicine to attempt to discharge me to an institutional group home – the only placement they could find.

# EXHIBIT I

That attempted institutionalization occurred solely because the City had no community-based, sensory-safe shelter option. This violates the *Olmstead* integration mandate and Title II of the ADA. *See Colbert v. Pritzker*, 2013 WL 5405656 (N.D. Ill. Sept. 26, 2013) (State cannot avoid ADA obligations by delegating services to private facilities).

**This hotel-based placement is the only thing preventing another such institutionalization attempt.**

---

## V. Geographic Access to Essential Services

Chicago's essential services – medical care, benefits offices, case management, crisis stabilization (Thresholds, Trilogy), and legal aid – are geographically centralized downtown or near CTA rail lines. My mobility and sensory disabilities make long, multi-transfer trips unsafe. I require a hotel placement downtown or within one mile of an accessible CTA train line to ensure predictable access to:

- Medical and psychiatric appointments
- My prospective future landlord (for Bridge Subsidy paperwork)
- Thresholds case management
- Benefits offices (SSA, HUD)

This is a functional access need, not a preference.

---

## VI. Strained Relationship with Current Provider

Due to the earlier retaliatory termination attempt (issued May 29, 2026) and SGA's refusal to engage in the interactive process, my working relationship with my current providers has been significantly strained. While staff have ceased inappropriate actions, the rupture in trust has made it difficult for me to fully engage with services. Beginning a transition search now allows DFSS to identify a hotel-based setting where I can fully participate in services and maintain stability, well before the June 26 deadline.

---

## VII. What I Am Requesting – Clearly & Narrowly

# EXHIBIT I

I ask DFSS to provide a hotel-based, non-congregate placement with the following specifications:

1. Private bedroom with private bathroom and shower (no shared facilities)
2. 24/7 access (no lockout hours)
3. Located downtown or within 1 mile of CTA train line (River North, Gold Coast, Streeterville, or comparable central neighborhood)
4. Preserves my homeless status for FDDP and Bridge Subsidy eligibility
5. Permits me to meet with case managers or providers in my room or an appropriate hotel space
6. Allows me to receive mail and disclose the address to service providers (not confidential)

I am open to relocating before June 26th if DFSS identifies an appropriate alternative. I require advance notice to prepare for the environmental transition due to my sensory and cognitive disabilities.

---

## VIII. Accommodation Process & Deadlines

Under applicable disability laws, DFSS is required to engage in the interactive process and provide a written determination on my accommodation request within a reasonable time. Please:

1. Identify the DFSS staff member responsible for processing ADA accommodation requests.
2. Provide a timeline for reviewing my request and identifying a placement by end of business on June 15th, 2026.
3. Advise on next steps before June 26th, 2026.

**Note: There is a pending offer to the City's Law Department (expiring June 12th, 2026) that may resolve the need for DFSS to act on this request. However, this accommodation request remains pending regardless. I'm giving a longer response deadline to give DFSS and the Law Department flexibility to coordinate on next steps.**

I am committed to working collaboratively. Please respond in writing by the end of business on June 15th, 2026, to ensure my safety and stability before the current placement expires on June 26th, 2026.

Thank you for your attention to this matter.

Sincerely,

# EXHIBIT I

/s/ Jessica Jamie Lehman

Jessica Jamie Lehman
(317) 450-9525
jessica@jessicaj.studio

Attachment:

- Dr. Paula Mathewson letters (March 18, 2026; April 2, 2026)

## *See Exhibit A

# Fax Confirmation Report EXHIBIT I

Sent via www.fax.plus



Fax.Plus

---

**Date:** Jun 06, 2026 (Sat)
**Time:** 05:05:46 PM (UTC-05:00)

**From:** +1 223-217-5138 (Jessica Lehman)
**To:** +1 312-743-0400

**Pages Sent:** 11
**Duration:** 7 min, 40 sec

**Status:** Successfully Sent

### First Page Thumbnail



Validate the authenticity of this page by scanning the following QR code:

* An official website of the City of Chicago   Here's how you know   EXHIBIT J

🔲🔳  English        ▼  →

**⬛✳ CHICAGO**

Accessibility

| Search | 🔍 |

I WANT TO        PROGRAMS AND INITIATIVES        GOVERNMENT        ABOUT

# Mayor's Office for People with Disabilities

Home / Departments / Mayor's Office for People with Disabilities / Accessibility Compliance / Services / City of Chicago Notice of Nondiscrimination

# City of Chicago Notice of Nondiscrimination

### City of Chicago Notice of Nondiscrimination based on Disability under the Americans with Disabilities Act and the Rehabilitation Act

By the requirements of Title II of the Americans with Disabilities Act of 1990, as amended ("ADA") and the Rehabilitation Act of 1973, as amended ("Rehabilitation Act"), the City of Chicago does not discriminate against qualified individuals with disabilities based on disability in any of its services, programs, or activities.

**Employment:** The City of Chicago does not discriminate based on disability in its hiring or employment practices and complies with all regulations promulgated by the U.S. Equal Employment Opportunity Commission under Title I of the ADA and the Rehabilitation Act.

**Effective Communication:** The City of Chicago will, upon request, provide appropriate aids and services to ensure effective communication for qualified persons with disabilities so they can participate in the City of Chicago's programs, services, and activities. Examples of auxiliary aids and services include but are not limited to qualified sign language interpreters, captioning, assistive listening devices, communication access real-time translation (CART), electronic documents, Braille documents, large print documents, note takers, and audio descriptions.

Anyone who requires an auxiliary aid or service to participate in a program, service, or activity of the City of Chicago should contact the department or agency responsible for that program, service or activity. Requests for auxiliary aids or services should be made as early as possible but no later than 72 hours before the scheduled program or activity. Although auxiliary aids and services may not be available if requested less than 72 hours before an event, the City will attempt to make an effective auxiliary aid or service available even if this deadline is not met.



EXHIBIT J

**Modifications to Policies and Procedures:** The City of Chicago will make all reasonable modifications to policies and procedures to ensure that people with disabilities have an equal opportunity to enjoy all of its programs, services and activities. For example, individuals with service animals are welcomed in City of Chicago offices, even where pets are generally prohibited.

Anyone who requires a modification of policies or procedures to participate in a program, service, or activity of the City of Chicago, should contact the department or agency responsible for the program, service or activity.

**Surcharges:** The City of Chicago will not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the cost of providing auxiliary aids/services or reasonable modifications of policy.

Neither the ADA nor the Rehabilitation Act requires the City of Chicago to take any action that would fundamentally alter the nature of its programs or services, or impose an undue financial or administrative burden.

**Complaints:** Complaints that a program, service, or activity of the City of Chicago is not accessible to persons with disabilities, is failing to provide appropriate auxiliary aids and services or has failed to make reasonable modifications to its policies and procedures to allow participation by individuals with disabilities should be directed to the Commissioner of the Mayor's Office for People with Disabilities for the City of Chicago, the City's designated ADA/Rehabilitation Act Coordinator. The City has established procedures for filing complaints under the ADA and the Rehabilitation Act. These procedures are posted on the Mayor's Office for People with Disabilities website.

Contact information for the City of Chicago's ADA/Rehabilitation Act Coordinator:

**Rachel Arfa, Commissioner**
Mayor's Office for People with Disabilities
City of Chicago
121 N. LaSalle Street, Suite 104
Chicago, Illinois 60602

Phone: 312.744.7209
TTY: 312.744.4964
Fax: 312.744.3314
Email: Rachel.Arfa@cityofchicago.org

Home    Disclaimer    Privacy Policy    Web Standards    Site Credits    Site Map    Contact Us    Press Room



**City of Chicago**
Copyright © 2010 - 2026 City of Chicago



# EXHIBIT J

* An official website of the City of Chicago **Here's how you know**

 **CHICAGO**

**Accessibility**

| Search | Q |

**I WANT TO**    **PROGRAMS AND INITIATIVES**    **GOVERNMENT**    **ABOUT**

# Mayor's Office for People with Disabilities

Home / Departments / Mayor's Office for People with Disabilities / Accessibility Compliance / Services / City of Chicago Grievance Procedure

# City of Chicago Grievance Procedure

## City of Chicago Grievance Procedure Under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973

This Grievance Procedure is established to meet the requirements of the Americans with Disabilities Act of 1990, as amended ("ADA") and the Rehabilitation Act of 1973, as amended ("Rehabilitation Act").  It may be used by anyone who wishes to file a complaint alleging discrimination based on disability in the provision of services, activities, programs, or benefits by the City of Chicago.  The City of Chicago's Personnel Policy governs employment-related complaints of disability discrimination.[1]

- Where possible, complaints should be in writing and should contain the name, address, telephone number, and email address of the person filing the complaint, along with a description of the alleged act[s] of discrimination.  If a complainant is unable to put his/her complaint in writing, he/she can file it by telephone, in-person statement, or using an appropriate auxiliary aid or service provided by the City of Chicago.
- Upon request, the City of Chicago will provide auxiliary aids and services to allow people with disabilities to file complaints.
- Complaints should be filed within sixty (60) calendar days from the date on which the complainant becomes aware of the alleged violation.
- As appropriate, the ADA/Rehabilitation Act Coordinator or her designee will investigate the complaint.  At the discretion of the ADA/Rehabilitation Act Coordinator or her designee, the investigation may be informal.  The investigation will be thorough and will afford interested persons and their representatives, if any, an opportunity to submit evidence relevant to the complaint.

- The ADA/Rehabilitation Act Coordinator or her designee will issue a written determination as to the validity of the complaint and a description of the resolution, if any, no later than thirty (30) days after the complaint is submitted in a format that is accessible to the complainant. If the complainant fails to cooperate with the investigation, the ADA/Rehabilitation Act Coordinator may extend the time to issue the determination or may dismiss the complaint without determination.
- The complainant can request a reconsideration of the case if he/she is dissatisfied with the resolution. The request for reconsideration must state the reason the complainant disagrees with the resolution and must be made no more than fifteen (15) days after the determination is issued. The ADA/Rehabilitation Act Coordinator shall issue a written response to the request for reconsideration within thirty (30) days of the request in a format that is accessible to the complainant.
- The ADA/Rehabilitation Act Coordinator shall maintain all files and records related to the complaints filed under this grievance procedure. All written comp English ▼ → ADA/Rehabilitation Act Coordinator or her designee as well as all ...................., evidence, and other documents, including those related to requests for reconsideration will be retained for at least three (3) years.
- The availability and/or use of this grievance procedure does not prevent a person from filing a complaint with another government agency, including but not limited to the U.S. Department of Justice. The pursuit of other remedies, including filing a complaint with a different agency, will not impact the resolution of the complaint filed with the ADA/Rehabilitation Act Coordinator.

[1] City of Chicago employees and job applicants must file employment-related discrimination complaints with the Department of Human Resources using the complaint procedures available under the City of Chicago Personnel Policy.

Complaints must be submitted to the Commissioner of the Mayor's Office for People with Disabilities, the designated ADA/Rehabilitation Act Coordinator for the City of Chicago, using the following contact information:

**Rachel Arfa, Commissioner**
Mayor's Office for People with Disabilities
City of Chicago
121 N. LaSalle Street, Suite 104
Chicago, Illinois 60602

Phone: 312.744.7209
TTY: 312.744.4964
Fax: 312.744.3314
Email: Rachel.Arfa@cityofchicago.org