



FILED

8/12/2026

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

GMC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

Jessica Lehman,

Plaintiff,

v.

City of Chicago,

Defendant.

Case No. 1:26-cv-07202

Judge Joan H. Lefkow

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

| Plaintiff | Defendant |
|---|---|
| Jessica Jamie Lehman | City of Chicago |
| Pro Se | Amie Medley |
| jessica@jessicaj.studio | amie.medley@cityofchicago.org |
| 317-450-9525 | 312-744-2742 |

The City's Motion to Dismiss (Dkt. 23) is remarkable for what it admits. In seeking dismissal, the City concedes that its shelter system is structurally incapable of accommodating individuals with disabilities that have needs that cannot be met in shared congregate shelters, and that its solution is to refer such individuals to "living facilities appropriate for those individuals"—institutional settings that violate *Olmstead v. L.C.* The City argues that because it has chosen to operate an inaccessible system, it is not required to make it accessible. This is not the law.

## I. THE CITY'S MOTION MISSTATES THE NATURE OF PLAINTIFF'S CLAIMS

The City repeatedly reframes Plaintiff's claims as a request for a hotel room (Dkt. 23 at 2), but Plaintiff's allegations—and the exhibits—show a **methods of administration** challenge to the City's system-wide absence of any ADA accommodation pathway. The Complaint does not seek a court-ordered hotel placement. It seeks declaratory and injunctive relief to remedy the City's systemic failure to provide any functional ADA accommodation process for individuals with disabilities, as is necessary to allow her accommodation request to be evaluated and considered to identify the correct reasonable accommodation under a functioning ADA system.

Defendants' ongoing failure to engage in the interactive process is not a past, isolated event, but a continuing, systemic policy. By way of illustration, even after the filing of this Complaint, the City's Department of Family and Support Services (DFSS) explicitly refused to accommodate Plaintiff's nerve damage, with Senior Counsel Amie Medley stating in writing that "**DFSS is not required to provide resources or accommodations that it does not already offer through its programs or services**"—asserting that DFSS provides only what it already offers, and therefore *categorically* does not modify its policies or practices to accommodate individuals with

disabilities, as further detailed in *Section IV* of this Response. Effectively, 'ask the shelter, not us', even though the City is the Title II entity. Under Seventh Circuit precedent, a plaintiff opposing a Rule 12(b)(6) motion may elaborate on her factual allegations with such consistent facts to demonstrate the plausibility and ongoing nature of the harm. See *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). There, the Seventh Circuit explains, "In the district court, too, a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove."

The City's own words in its Motion also separately confirm this systemic failure:
"Due to limited resources, the city shelter system does not have enough available beds to serve every adult experiencing unsheltered homelessness" and "the City-funded shelters cannot support patients with post-acute care needs." Dkt. 23 at 8 (quoting Dkt. 13, Pl. Ex. D, Guidance at 1).

The City then argues that because its system cannot accommodate individuals with disabilities, providing accommodations would be a "fundamental alteration." Dkt. 23 at 8. But as demonstrated below, the City cannot claim "fundamental alteration" when its own admissions show the alteration is required by law.

## II. THE CITY ADMITS ITS SHELTER SYSTEM IS STRUCTURALLY INACCESSIBLE AND DEFAULTS TO INSTITUTIONALIZING DISABLED INDIVIDUALS

In its Memorandum, the City quotes its own Guidance to argue that providing accommodations would be a "fundamental alteration." Dkt. 23 at 8. But the Guidance says far more—and is far more damaging to the City's position:

"The guidance ... sets out a detailed process for hospitals discharging individuals who cannot stay at City-funded shelters, including by coordinating with the State of Illinois or directly with **living facilities appropriate for those individuals.**" Dkt. 23 at 8 (quoting Dkt. 13, Pl. Ex. D, Guidance at 5) (emphasis added).

This is a direct admission of unnecessary institutionalization. The City is admitting that when its shelter system cannot accommodate individuals with disabilities, its solution is to refer them to institutional settings—nursing homes, group homes, or other facilities. That is exactly what *Olmstead v. L.C.* prohibits.

The facilities referenced in the Guidance (Exhibit D of Complaint) include nursing homes, group homes, SMHRFs, and medical respite—institutional or semi-institutional settings, not integrated community placements. These are not integrated settings under *Olmstead*. The City's own Guidance confirms that its shelter system cannot accommodate individuals with disabilities, and its proposed alternatives violate the ADA's integration mandate. The City's admission that its shelter system is structurally incapable of accommodating disabled individuals is an admission of liability, not a defense.

## III. HOTELS ARE NOT JUST REASONABLE—THEY ARE FISCALLY RESPONSIBLE

The City argues that providing hotel placements or other private room arrangements would be an undue burden and a "fundamental alteration," but it conveniently ignores the massive public cost of *not* accommodating individuals like Plaintiff. As alleged in *Complaint #56*, municipal crisis response costs—including unreimbursed ambulance transports, psychiatric holds, emergency room churn, police response, avoidable incarceration, and shelter churn—*match or exceed* what the City would spend on a hotel placement.

When disabled individuals like Plaintiff are forced into a medically inappropriate congregate setting, they predictably enters psychiatric and other medical crises, triggering a cascade of expensive public services: 988 crisis calls, mobile crisis response, ER visits, ambulance rides (which Medicaid reimburses far below cost), and crisis stabilization stays. These avoidable public expenses far exceed the cost of a hotel voucher. Denying the accommodation was not merely discriminatory; it is fiscally irrational. In addition, the City cannot claim a 'fundamental alteration' when providing a hotel room is cheaper than the crisis response it currently pays for—especially when it already provides the same accommodation to other populations and the requested modification does not change the essential nature of its programs. This is providing the **same service of sheltering the homeless in a different location**, not transforming a homeless shelter into a substance-abuse rehabilitation facility.

IV. THE CITY'S "YOU RECEIVED THE ACCOMMODATION" ARGUMENT FAILS

The City argues that because Plaintiff was placed in the GBV hotel program, she "received the requested accommodation." Dkt. 23 at 5-6. The City states: "First and foremost, the accommodation Plaintiff requested—a private room and bathroom—has been provided. As Plaintiff acknowledges in the Complaint, her placement through the GBV hotel program 'met her sensory and trauma needs.'" Dkt. 23 at 5-6. This argument is false for multiple reasons.

First, Plaintiff was forced to re-classify as a GBV survivor in order to receive a placement that met her disability-related needs. This accommodation never came about through the interactive process—it came through general program eligibility based on a re-classification that should not have been necessary. The City's "methods of administration" forced Plaintiff to navigate a system that had no ADA pathway and required her to be re-classified in order to receive basic access.

Second, the actual damages Plaintiff incurred—out-of-pocket hotel costs from her SSI award and funds borrowed from family—would not have occurred if not for the City's methods of administration violations and the lack of equal parity between GBV survivors and individuals with disabilities. These damages are not speculative; they are actual expenses directly resulting from the City's failure to accommodate *before* Plaintiff was re-classified and referred—from April 8–28, 2026.

Third, as Plaintiff's June 6, 2026 ADA accommodation request (Exhibit I) makes clear, she asked DFSS to engage in the Interactive Process to identify a hotel-based, non-congregate placement located downtown or within one mile of an accessible CTA rail line—specifically, River North, Gold Coast, Streeterville, or a comparable central neighborhood—to ensure safe access to essential services such as urgent care, pharmacies, and stores. DFSS did not evaluate the fiscal feasibility or reasonableness of these disability-related requirements, instead stating that "DFSS is not required to provide resources or accommodations that it does not already offer through its programs or services." Because DFSS never engaged in the interactive process, the accommodation requested on June 6th was denied.

The City's argument that the GBV placement satisfies ADA obligations is a classic "methods of administration" violation: the City has adopted criteria and methods of administration "that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3). Elevating one protected class (GBV survivors) over another (individuals with disabilities) is discrimination.

V. THE CITY'S OWN ADMISSIONS DEMONSTRATE THAT ITS "FUNDAMENTAL ALTERATION" DEFENSE IS MERITLESS

The City bears the burden of proving that a requested modification would fundamentally alter its program. 28 C.F.R. § 35.130(b)(7). The City has not met this burden. In fact, the City's own words in its Motion prove the opposite.

The City argues that because its Guidance acknowledges "that certain individuals cannot be accommodated in the shelter system itself and must be referred to other resources," this "indicates that the accommodations Plaintiff seeks would be a fundamental alteration of the shelter system." Dkt. 23 at 8. The City then states:

"Granting her requested relief would require DFSS and its delegate agencies to start offering private accommodations that they do not currently offer, and to do so with resources they do not have. That is a 'fundamental alteration in the nature of' the City's homeless services, and it is therefore not a reasonable accommodation within the meaning of the ADA and the Rehabilitation Act." Dkt. 23 at 8.

This argument is legally indefensible. The City is effectively arguing: *"We have designed a system that categorically excludes individuals with disabilities, and because we have not allocated resources to make it accessible, we are not required to do so."* The ADA does not allow a public entity to claim "fundamental alteration" based on its own deliberate choice to maintain an inaccessible system. As the Seventh Circuit has held, a public entity cannot "avoid its obligations under the ADA by simply refusing to allocate resources to accommodate individuals with disabilities." *See Olmstead*, 527 U.S. at 603-04.

Moreover, the City's own exhibits show it already operates non-congregate placements for GBV survivors and has historically used hotel vouchers during COVID. A modification is not a "fundamental alteration" when the City already performs the same function for another

population. The City's claim that it would have to "start offering private accommodations that they do not currently offer" is false—the City *already offers* private hotel accommodations to GBV survivors. Providing the same type of placement to individuals with disabilities is not a "new program"—it is equal access to an existing program. The City cannot simultaneously argue that it provides hotel accommodations to GBV survivors and that providing the same accommodations to disabled individuals would be a "fundamental alteration."

## VI. DFSS CANNOT OUTSOURCE ITS ADA OBLIGATIONS TO DELEGATE AGENCIES

The City's Motion implicitly advances a dangerous defense: that its delegate agencies (like SGA and other providers) are responsible for accommodations, and that DFSS itself is merely a funder. This is legally indefensible.

Under Title II of the ADA, 42 U.S.C. § 12131(1)(B), the City is the "public entity." The implementing regulations explicitly state that a public entity may not, *through its methods of administration or use of contractors*, subject individuals with disabilities to discrimination. 28 C.F.R. § 35.130(b)(1)-(3). A public entity cannot avoid liability by contracting out its obligations.

The City's Motion repeatedly refers to SGA as "one of the City's delegate agencies" (Dkt. 23 at 3), but this does not absolve the City of responsibility. Just as the State of Illinois could not avoid its ADA and *Olmstead* obligations by delegating long-term care services to nursing homes, *see Colbert v. Pritzker*, 2013 WL 5405656 (N.D. Ill. Sept. 26, 2013), the City cannot avoid liability for discrimination carried out by its delegate agencies. In *Colbert*, this Court held that the State remained responsible for ensuring community-based options even though services were delivered through private facilities. Likewise here, DFSS is the Title II entity responsible for

ensuring ADA-compliant access to shelter services. Its delegate agencies operate as its instrumentalities. **The City's implication that Plaintiff should "ask the shelter" or deal solely with its contractors is an improper delegation of a non-delegable duty under federal law.**

## VII. HOTELS AND PRIVATE ROOMS ARE REASONABLE ACCOMMODATIONS BECAUSE THE CITY ALREADY OFFERS THEM TO OTHER POPULATIONS

The City already operates non-congregate hotel placements for survivors of gender-based violence. It also contracts for additional non-congregate hotel capacity through its shelter RFPs and has historically used hotel vouchers during COVID. Providing the same type of placement to individuals with disabilities is not a "new program"—it is equal access to an existing program.

Under program access, a public entity cannot offer a benefit to one protected class (GBV survivors) while denying the same benefit to disabled individuals. A policy of excluding disabled individuals from a program that already exists is discrimination, not a fundamental alteration.

The City's own Motion confirms that it has the capacity to provide hotel placements. It argues that Plaintiff was accommodated through the GBV program—which proves that hotel placements are available. The City cannot simultaneously argue that it provides hotel accommodations to GBV survivors and that providing the same accommodations to disabled individuals would be a "fundamental alteration."

## VIII. THE CITY'S ARGUMENT WOULD NULLIFY THE ADA, SECTION 504, AND OLMSTEAD

The City's central argument—that it is not required to provide accommodations that it does not currently offer—is legally indefensible. If accepted, it would effectively nullify the Americans

with Disabilities Act, Section 504 of the Rehabilitation Act, and the integration mandate of *Olmstead v. L.C.* The ADA requires reasonable modifications to policies, practices, and procedures—not merely access to existing services. The City's interpretation would render the reasonable modification requirement a nullity.

The City's position mirrors the exact argument rejected in *Olmstead*: that a public entity need not modify its programs if it does not already offer the requested service. *See Olmstead v. L.C.*, 527 U.S. 581, 603-04 (1999) (rejecting argument that state was not required to provide community-based services because it did not already offer them). The City's argument—"Granting her requested relief would require DFSS and its delegate agencies to start offering private accommodations that they do not currently offer" (Dkt. 23 at 8)—is precisely the argument the Supreme Court rejected in *Olmstead*.

This is a classic methods of administration violation. The City has adopted criteria and methods of administration "that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3). By refusing to create an ADA accommodation pathway and instead forcing disabled individuals to re-classify as GBV survivors to access non-congregate housing, the City has constructed a system that is structurally inaccessible to individuals with disabilities.

IX. THE INTERACTIVE PROCESS CLAIM IS PROPERLY PLEADED

The City argues that there is no independent cause of action for failure to engage in the interactive process. Dkt. 23 at 9. This is correct—but Plaintiff is not bringing a stand-alone claim. Plaintiff alleges that the City's failure to engage in the interactive process resulted in its failure to provide a reasonable accommodation.

Under *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000), the interactive process is a "means and not an end in itself." Liability attaches when the breakdown in the interactive process results in the failure to provide a reasonable accommodation.

Here, the breakdown is total and systemic. On June 6, 2026, Plaintiff submitted a formal ADA accommodation request to DFSS (Exhibit I to Complaint). In that request, she explicitly asked DFSS to:

1. Identify the DFSS staff member responsible for processing ADA accommodation requests.
2. Provide a timeline for reviewing her request.
3. Advise on next steps before June 26, 2026.

DFSS never responded to these questions. The City never identified a decision-maker. It never provided a timeline. It never engaged in the proper dialogue to identify the reasonable accommodation. Instead, the City remained silent until Plaintiff was forced to seek judicial intervention.

The City's Motion argues that "the ADA requires only a response within a reasonable time" (Dkt. 23 at 2) and that "Plaintiff simply had not heard back from the City or SGA by June 18, when she filed her lawsuit" (Dkt. 23 at 8). But a complete failure to respond to a specific request for the identity of the decision-maker and a proposed accommodation is not a "delay"—it is a refusal to engage in any interactive process. The City cannot claim it participated in good faith when it cannot even identify who at DFSS has the authority to grant an accommodation. This complete breakdown directly resulted in the denial of Plaintiff's accommodation request—precisely the scenario *Rehling* contemplates.

Moreover, the City's own argument about the interactive process is internally inconsistent. The City states that "an appropriate accommodation was identified and provided to Plaintiff; thus she cannot succeed on a claim for failure to engage in the interactive process." Dkt. 23 at 9. But as demonstrated above, the accommodation was provided through a re-classification to GBV status, not through any ADA interactive process. The City cannot claim it engaged in the interactive process when it never responded to Plaintiff's formal ADA request and never identified who at DFSS could grant accommodations

---

X. DAMAGES ARE PROPERLY PLEADED

The City argues that Plaintiff has not alleged deliberate indifference. Dkt. 23 at 15-16. The City states: "Plaintiff's Complaint alleges neither knowledge nor a failure to act." Dkt. 23 at 15. This is wrong. Plaintiff is seeking actual damages—out-of-pocket hotel costs incurred *before* she was re-classified (April 8–28, 2026). These are actual, documented expenses, not speculative harms.

To recover compensatory damages, a plaintiff must show deliberate indifference. *Lacy v. Cook County*, 897 F.3d 847, 863 (7th Cir. 2018). The standard requires "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." Plaintiff has plausibly alleged both:

- Knowledge: The City had Dr. Mathewson's letters (Exhibit A to Complaint) and DFSS explicitly acknowledged her need for a non-congregate placement (Exhibit C to Complaint). The City's own Motion acknowledges that "DFSS informed Plaintiff that no private rooms were available" and that private space in the shelter system "is extremely limited." Dkt. 23 at 3. This demonstrates knowledge of the disability-related need.

- Failure to Act: Despite this knowledge, the City offered only medically contraindicated congregate shelters, admitted it had no private inventory (Exhibit D, Guidance), and failed to respond to her formal ADA request (Exhibit I). The City's Motion admits that "DFSS had not responded to her accommodation request" by the time she filed her Complaint. Dkt. 23 at 3.

Moreover, the City's deliberate indifference is shown by its systemic failures: an inaccessible 311 system, a definition of "non-congregate" that includes shared rooms, and the admission in its own Guidance that its solution for disabled individuals is institutionalization. The City's Motion concedes that "DFSS informed Plaintiff that no private rooms were available" (Dkt. 23 at 3) and that "private spaces in the shelter system 'are extremely limited'" (Dkt. 23 at 3). These are not "mere negligence"—they are deliberate policy choices that categorically exclude disabled individuals. The City's systemic refusal to create an ADA process is the very definition of deliberate indifference. Plaintiff has more than adequately pleaded damages at this stage.

## XI. THE RETALIATION CLAIM IS PROPERLY PLEADED

The City argues that the termination notice was rescinded and therefore does not constitute an adverse action. Dkt. 23 at 12-13. The City states: "Plaintiff has not pled—nor can she plead—that she has suffered an adverse action for purposes of her retaliation claim. Plaintiff admits in her Complaint that the termination notice ... was rescinded." Dkt. 23 at 12. However, a rescinded termination notice issued in response to protected activity is still an adverse action because it threatens imminent harm and creates a chilling effect. The termination notice was rescinded only after Plaintiff served a draft of an emergency TRO motion on the City's Law

Department. The City cannot argue that the threat was not real when it required the threat of judicial intervention to withdraw. The harm was real, not hypothetical.

Additionally, as alleged in the Complaint, SGA routinely extends stays beyond 60 days for other residents while denying extensions to Plaintiff—a disabled resident who requested accommodations. This disparate treatment—granting extensions to non-disabled residents while denying one to a disabled resident who requested accommodations—further demonstrates retaliation and discrimination. (Complaint ¶¶ 63-64). The City's Motion does not address this disparate treatment, which independently supports the retaliation claim.

XII. THE CITY'S VOLUNTARY CESSATION ARGUMENT FAILS UNDER *FRIENDS OF THE EARTH*

The City's argument that Plaintiff's claims are mooted by her current placement is foreclosed by *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), which holds that voluntary cessation does not moot a case unless the defendant can demonstrate as an affirmative defense at trial that the challenged conduct cannot reasonably be expected to recur. Even if this was at trial, the City has not made that showing. The City has no ADA process, no decision-maker, no form, and no inventory of non-congregate rooms for disabled individuals. Its actions are voluntary, temporary, and revocable—the very definition of conduct that can "reasonably be expected to recur." Because Plaintiff's ADA accommodation request has never been fully evaluated or granted, and because recurrence risk persists as long as Plaintiff is a resident of the City of Chicago and must continue accessing DFSS-administered City services—including homeless services and programs such as rental assistance—under the same

non-existent ADA system, the likelihood of repetition remains ongoing under the voluntary cessation standard.

The City's Motion confirms this: it asserts that "the ADA requires only a response within a reasonable time" (Dkt. 23 at 2), and that "an appropriate accommodation was identified and provided to Plaintiff" (Dkt. 23 at 9), even though the extension was only authorized after IFP was granted and a hearing date was scheduled on the TRO Motion.

## XIII. THE COURT HAS POWER TO ORDER STRUCTURAL RELIEF WHEN NECESSARY TO GRANT THE INDIVIDUAL FULL RELIEF

Because this case did not proceed as a class action, Plaintiff agrees in part with Defendant that the relief described in her "Systemic Relief for All Similarly Situated Individuals" section should be construed narrowly to *only what is necessary to cure her individual harm* (see *Trump v. CASA, Inc.*). Plaintiff does not seek the broader systemic items listed in #69(a) and #69(c), which would be appropriate only in a class action. Plaintiff seeks the structural relief necessary to fully cure her own ADA violation and prevent risk of recurrence individually. Any broader systemic effects are incidental to the principle of complete relief.

## XXIV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss should be DENIED. Plaintiff has plausibly alleged claims for failure to accommodate that resulted from a failure to engage in the interactive process, deliberate indifference, methods-of-administration violations, retaliation, and damages. The City's arguments misstate the law, ignore the systemic nature of Plaintiff's claims,

rely on a "fundamental alteration" defense they have not established, and are contradicted by the City's own exhibits.

The City's admission that "certain individuals cannot be accommodated in the shelter system itself and must be referred to other resources" (Dkt. 23 at 8) is a direct admission of unnecessary institutionalization—exactly what *Olmstead* prohibits. Its admission that "granting her requested relief would require DFSS and its delegate agencies to start offering private accommodations that they do not currently offer" (Dkt. 23 at 8) is an admission that it has designed a system that categorically excludes individuals with disabilities. Its failure to provide any functional ADA process—no form, no decision-maker, no timeline—confirms that DFSS has no functional ADA process. The City cannot just say "ask the shelter" to outsource its ADA obligations to delegate agencies. It cannot claim "fundamental alteration" when hotels are cheaper than crisis response and it does not alter the nature of the program. It cannot claim mootness when it has left the failure intact. These contradictions must be resolved in Plaintiff's favor at the Rule 12(b)(6) stage.

Respectfully submitted,

s/ Jessica Jamie Lehman

Address: Confidential (Sealed Address Sheet Attached Under LR 5.7)

Chicago, IL 60612

Phone: (317) 450-9525

Email: jessica@jessicaj.studio

Plaintiff, Pro Se

Dated: August 12th, 2026