**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

Jessica Lehman,

Plaintiff,

v.

City of Chicago,

Defendant.

Case No. 1:26-cv-07202

Judge Joan H. Lefkow

# Renewed Emergency Motion For Temporary Restraining Order With Notice and Preliminary Injunction

Plaintiff Jessica Jamie Lehman, proceeding pro se, moves this Court under Federal Rule of Civil Procedure 65 for a Temporary Restraining Order ("TRO") with notice and a Preliminary Injunction. This emergency motion raises severe concerns regarding Defendant's **candor to the tribunal**, as the City is actively seeking dismissal of this case based on the illusion of a stable ADA accommodation that it is simultaneously dismantling. Because the City is abruptly rescinding this approved placement without any interactive process or replacement, in direct

contradiction to the binding representations it just made to this Court, Plaintiff respectfully requests that the Court immediately enjoin Defendant's impending **September 30, 2026 termination** date and preserve the status quo. In support, Plaintiff states as follows:

---

## I. INTRODUCTION AND CANDOR TO THE COURT

1. This Court previously denied Plaintiff's initial request for a TRO without prejudice because the City represented that it had provided the requested accommodation and that Plaintiff was safely housed.
2. The City of Chicago secured that favorable ruling, and subsequently filed a pending Motion to Dismiss, based on the representation that Plaintiff's housing was stable. Specifically, the City represented to this Court in its TRO Response: "we have communicated directly with SGA and confirmed that your current placement through the Gender Based Violence (GBV) hotel program will not be terminated while you are working toward obtaining stable housing through other available programs" (See Exhibit T).
3. Relying on this exact assurance, the City then argued in its Memorandum supporting its Motion to Dismiss that "an appropriate accommodation was identified and provided to Plaintiff" (Dkt. 23 at 8).
4. The City doubled down on this factual premise just days ago. On September 15, 2026, the City filed its Reply in Support of its Motion to Dismiss, arguing that "because Plaintiff has been provided a private room and bathroom through the GBV hotel program... no failure to accommodate has occurred" (Dkt. 29 at 2). The City explicitly asked this Court

to dismiss the case because "an appropriate accommodation was identified and provided" (Dkt. 23 at 8), claiming this mooted any allegations resulting from an inadequate interactive process.

5. A mere nine days after the City filed that September 15 Reply, the placement was abruptly terminated in direct contradiction to the City's representations. Despite the written guarantees submitted to this Court (See Exhibit T), Plaintiff received confirmation from SGA staff member Georganne Struss that all residents are being categorically exited from the SGA hotel program on September 30, 2026, with no transition plan in place (See Exhibit P). This is SGA's second termination attempt that was only confirmed by text, without any formal letter, even when directly requested (Exhibit S). The City never notified Plaintiff of the termination nor that SGA's funding and therefore her guaranteed placement were both about to lapse.
6. At no point did DFSS conduct an interactive process to prepare for this discharge, nor did the City notify the Court that the grant funding the accommodation was expiring. Instead, the City actively sought dismissal of the case based on an assurance of stability it knew, or should have known, was weeks away from expiring.
7. On September 24th, 2026, Plaintiff provided the City's Senior Counsel, Amie Medley, with formal notice of this imminent eviction in an attempt to resolve this emergency mutually. After initially stating she was "looking into this," Counsel sent a late-day follow-up confirming that the City "unfortunately [doesn't] have any updates," providing no written guarantee or extension to maintain the placement (See Exhibit Q). The Court must not allow the City to pull the rug out from under Plaintiff without warning to either Plaintiff or the Court. Permitting the City to unilaterally dismantle an **approved**

**accommodation** that they explicitly guaranteed would not be terminated while Plaintiff sought stable housing would destroy Plaintiff's stability and fundamentally jeopardize her ability to continue participating in this litigation.

8. For the Court's reference, a true and correct copy of Plaintiff's original Emergency Motion for Temporary Restraining Order (Dkt. 5), which this Court denied without prejudice based entirely on the City's now-rescinded guarantees of stability, is attached (See Exhibit R). Plaintiff incorporates that prior motion by reference to demonstrate that the exact irreparable harm the City previously claimed was moot is now imminent.

---

## II. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.
10. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in Chicago, Illinois, and Defendant City of Chicago resides in this district.

---

## III. LEGAL STANDARD

11. The standard for issuing a temporary restraining order ("TRO") with notice is the same as for a preliminary injunction. *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (holding that a TRO issued after notice is "procedurally as well as functionally even more like a preliminary injunction than a TRO issued without notice

and hearing"). The movant must show: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; (3) irreparable harm absent injunctive relief; and (4) that the balance of equities and the public interest favor injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff is proceeding with notice under Rule 65(a) and will serve this motion on Defendant through the CM/ECF portal immediately.

---

## IV. FACTS SUPPORTING IMMEDIATE RELIEF

### A. Medical Necessity and Rescission of the Accommodation

12. Plaintiff is a 24-year-old autistic transgender woman with Autism Spectrum Disorder, Major Depressive Disorder, Post-Traumatic Stress Disorder, Borderline Personality Disorder (Exhibit A, Mathewson letter). In addition, Plaintiff has nerve damage that causes her mobility limitations and fall risk (See Exhibit O).
13. Dr. Paula Mathewson, Plaintiff's psychiatrist, has documented that congregate shelter settings are medically unsafe for Plaintiff and would predictably result in psychiatric destabilization, including acute anxiety, dissociation, meltdowns, and suicidal ideation. Plaintiff requires a private, non-congregate, sensory-controlled sleeping environment with 24/7 access, use of noise-canceling headphones and phone, predictable transitions, and case management conducted only in quiet, sensory-safe spaces. (Exhibit A).
14. The City successfully accommodated these medical needs for months. On June 23, 2026, DFSS Deputy Commissioner Daniel Castañeda issued a letter confirming the GBV hotel

program satisfied Plaintiff's accommodation request, explicitly stating the program "does not place a limit on the length of your stay" (See Exhibit T).

**B. The Absence Of Any Interactive Process**

15. When Plaintiff previously requested a placement closer to centralized services due to nerve-damage-related balance issues and fall risks, a continuation of the interactive process requested when this case was filed (See Exhibit I), DFSS did not engage in a good faith dialogue to identify a reasonable accommodation. Instead, DFSS functionally abandoned the interactive process and shifted the burden of ADA compliance entirely onto Plaintiff. On July 30, 2026, DFSS Project Manager Laura Ng explicitly instructed Plaintiff to "contact [a different provider, CAWC] directly at their 24/7 hotline to explain your situation and check in regularly to see if there is an opening". Ng justified this refusal by claiming that "emergency hotel placement is on a first-come, first-served basis" (See Exhibit K). Telling a disabled individual to call a standard public hotline to compete for a "first-come, first-served" bed is the exact opposite of an interactive process; it is a structural refusal to provide a reasonable accommodation or modification (See Exhibit N).
16. Crucially, throughout this summer, DFSS failed entirely to disclose that the SGA program grant was expiring, completely denying Plaintiff any interactive process to plan for a safe transition.

**C. The City's Categorical Legal Refusal and Imminent Discharge**

17. On July 31, 2026, Senior Counsel Medley formally denied any further accommodations, adopting a policy of categorical refusal (See Exhibit L). Medley stated the City "does not agree that an alternative location beyond that already provided by SGA is required," asserting that providing one would "fundamentally alter the nature of the service," and that "DFSS is not required to provide resources or accommodations that it does not already offer through its programs or services" (See Exhibit L).

18. The City's assertion that it is not required to provide accommodations it does not already offer is a direct nullification of federal disability law. If a municipality were only required to provide what it already routinely offers, the ADA's modification requirement would be rendered entirely meaningless. Rather than conducting a legally required individualized assessment utilizing factors like logistical feasibility, budget, medical need, and implementation timelines, the City adopted a blanket policy of refusal. Despite the City's own Notice of Nondiscrimination guaranteeing a modification process by contacting the department responsible (See Exhibit J), DFSS completely ignored Plaintiff's explicit, written requests asking to identify the ADA decision-maker, to clarify available accommodation tools, and to establish a timeline (See Exhibits I and N). This fundamentally broken system expects disabled individuals to navigate inaccessible standard procedures, such as instructing Plaintiff to call a standard public hotline for a shelter bed.

19. This deliberate indifference culminates in a catastrophic administrative failure: the City completely failed to flag a legally guaranteed ADA accommodation at a specific placement undergoing a mass termination event, recklessly allowing a disabled resident to be displaced from her necessary accommodations without any intervention.

20. Having stalled the interactive process and withheld any notice of the impending grant expiration, the City now intends to exit Plaintiff on **September 30, 2026**. The City has offered no transition plan, no portable voucher, and no alternative accessible placement, ensuring Plaintiff will be discharged to the street or forced back into the structurally inaccessible 311 queue that previously failed her with an attempted discharge to an institutional group home on April 9, 2026 (Dkt. 1 at 11). Tellingly, while the City recently argued in its Motion to Dismiss Reply that Seventh Circuit precedent defines appropriate community placements as "houses or apartments in residential settings that can accommodate between one and eight residents," citing *Ill. League of Advocs. for the Developmentally Disabled v. Ill. Dep't of Hum. Servs., 803 F.3d 872, 873-74 (7th Cir. 2015)*, the City admitted in a footnote on the exact same page (Dkt. 29 at 8), that its own group homes operate as institutional settings "occupied on a permanent basis by a group of not less than 9 and not more than 15 unrelated persons with disabilities" under MCC § 17-17-102(A)(3)(b). By their own admission, the City's default alternative is a medically contraindicated, institutionalized setting that violates the very legal standards they cite to this Court.

21. The City also attempts to insulate this institutional model by deliberately narrowing the ADA's integration mandate. In that same Reply, the City argued that Olmstead only applies to plaintiffs confined in a "psychiatric unit," claiming that an offer of a group home is a "far cry" from institutionalization (Dkt. 29 at 8). But this Court has already squarely rejected such a restrictive reading of federal disability law. As this Court established in *Colbert v. Pritzker*, 2013 WL 5405656 (N.D. Ill. Sept. 26, 2013), the ADA's protections against unnecessary segregation extend to all institutional facilities,

far beyond locked psychiatric wards. Whether the City attempts to force Plaintiff into a congregate group facility that strips her of autonomy, or abandons her to the street where acute psychiatric hospitalization is a medically documented certainty, the City's failure to accommodate Plaintiff results in the exact type of institutional segregation this Court has explicitly prohibited.

---

## V. LIKELIHOOD OF SUCCESS ON THE MERITS

22. Plaintiff is likely to succeed on the merits. Under *Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725 (N.D. Ill. 2014), when an entity has already provided a reasonable accommodation, "the question becomes instead whether it was reasonable for [the defendant] to withdraw that existing accommodation." This court held in *Isbell* that without evidence of an "undue burden," the justification for withdrawing it is "plainly 'no,'" and that the entity's obligation under the ADA is "to work with [Plaintiff] to adjust the existing accommodation in an attempt to correct those problems, not simply to alter the accommodation to her detriment." The City granted the private room, maintained it for months, and explicitly relied on it to defeat a TRO and request dismissal of this case. The City has presented zero evidence that maintaining this specific accommodation poses an undue burden. Instead of working with Plaintiff to adjust or safely transition the accommodation as funding changed, the City is simply altering the accommodation to her extreme detriment by abandoning her to a September 30 street discharge. **The burden is now entirely on the City to justify its rescission, and it has not done so.**

23. Furthermore, the City's actions constitute deliberate indifference, substantiating Plaintiff's claims for damages. Under *Lacy v. Cook County*, 897 F.3d 847 (7th Cir. 2018), deliberate indifference requires knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood. The July 31 categorical refusal (See Exhibit L), the July 30 hotline referral (See Exhibit K), and the impending September 30 termination (See Exhibit P) following written promises to the contrary demonstrate explicit knowledge coupled with a failure to act.
24. Because Plaintiff exhaustively attempted to resolve this administratively with Senior Counsel and DFSS prior to seeking the Court's intervention, she has made good faith efforts to resolve the emergency with opposing counsel and despite good faith efforts has been unable to resolve the emergency (See Exhibit M).

---

## VI. IRREPARABLE HARM, BALANCE OF EQUITIES, AND PUBLIC INTEREST

25. Plaintiff is not asking the Court to force the City to create a new program. Rather, Plaintiff is asking the Court to require the City to maintain her approved accommodation baseline of a private room with a private bathroom, along with other granted accommodations, and to ensure she is not pushed to the edge of the City away from critical services while the pending Motion to Dismiss is resolved. This accommodation baseline was already approved in writing by Deputy Commissioner Castañeda (See Exhibit T), and was provided as part of DFSS's existing Gender Based Violence (GBV) hotel program, which utilizes SGA Youth & Family Services and Connections for Abused Women and Children (CAWC) as its two delegate agencies. The City retains the

flexibility to choose exactly how it implements and funds this requirement, so long as the medically required setting is preserved and Plaintiff's approved accommodations are not contradicted or rescinded.

26. Without immediate injunctive relief, Plaintiff will be evicted on September 30, 2026. This date-certain eviction will force her into medically contraindicated settings, triggering near-certain risk of acute psychiatric destabilization and likely imminent institutionalization.
27. The balance of equities heavily favors Plaintiff. The City cannot claim a hardship in maintaining a placement it explicitly told this Court it would maintain.
28. The public interest strongly favors enforcing the ADA and preventing the severe public costs of psychiatric crisis, emergency room visits, mobile-crisis dispatches, and institutionalization, which far outweigh the cost of maintaining a hotel room the City already funds.

---

**VII. REQUESTED RELIEF**

Plaintiff respectfully requests that the Court:

A. Issue a Renewed Temporary Restraining Order, effective immediately, preserving the status quo by enjoining Defendant City of Chicago from discharging Plaintiff to the street or a medically contraindicated congregate setting on September 30, 2026, and requiring the City to maintain her approved accommodation baseline (a private room and private bathroom that does not isolate her from critical services, plus other approved accommodations listed in Exhibit T),

whether at her current location or a comparable alternative placement, pending resolution of the Motion to Dismiss and further order of the Court.

B. Order Defendant to file a written statement with the Court confirming whether it will maintain Plaintiff's placement pending her achieving permanent housing, or to the resolution of this case, whichever comes sooner.

C. Set an expedited hearing on this motion before September 30, 2026, and order Defendant to file a written response by a date set by the Court.

D. Retain jurisdiction to enforce this order.

---

**VIII. VERIFICATION**

I, Jessica Jamie Lehman, declare under penalty of perjury under the laws of the United States that the facts stated in this motion are true and correct to the best of my knowledge, based on my personal experience, and the attached exhibits are true and correct copies of the documents they purport to be.

/s/ Jessica Jamie Lehman

Dated: September 26th, 2026

---

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26th, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jessica Jamie Lehman

---

**Attachments (Exhibits):**

- **Exhibit A:** Letter from Dr. Paula Mathewson, MD (April 2, 2026)
- **Exhibit D:** City of Chicago Tier II Hospital Discharge Guidelines (September 2025)
- **Exhibit I:** Plaintiff's ADA Accommodation Request to DFSS (June 6, 2026) and Fax Confirmation
- **Exhibit J:** City of Chicago Notice of Nondiscrimination and Grievance Procedure (printed from City website on June 13, 2026)
- **Exhibit K:** July 30, 2026, Email from Laura Ng directing Plaintiff to CAWC hotline
- **Exhibit L:** July 31, 2026, Email from Amie Medley categorically refusing further accommodations responding to Exhibit K
- **Exhibit M:** July 24, 2026, Email thread demonstrating attempt to notify counsel and resolve emergency mutually.
- **Exhibit N:** July 30, 2026, Email from Plaintiff responding to Exhibit K detailing constructive denial
- **Exhibit O:** June 23, 2026, Email from Plaintiff detailing nerve damage and mobility concerns

- **Exhibit P:** Text communication from SGA staff (Georganne Struss) confirming September 30, 2026 program termination date
- **Exhibit Q:** September 25, 2026, Email from Amie Medley acknowledging notice of the impending discharge
- **Exhibit R:** Plaintiff's Original Emergency Motion for Temporary Restraining Order
- **Exhibit S:** Texts to Maddison Bishop and Sianny Munroe From SGA Youth and Family Services (SGA) Requesting Formal Termination Letter
- **Exhibit T:** June 23, 2026, and July 1, 2026, Accommodation Letters from Deputy Commissioner Castañeda submitted by Amie Medley (Dkt. 17)

---

Respectfully submitted,

/s/ Jessica Jamie Lehman

Address: Confidential (Sealed Address Sheet Attached Under LR 5.7)

Chicago, IL 60612

Phone: (317) 450-9525

Email: jessica@jessicaj.studio

Plaintiff, Pro Se

Dated: September 26th, 2026